James G. **LIFSHUTZ**, Liberty Financial Corporation, Liberty Properties Partnership, Texas Home Improvements, Inc., and Berlee Lumber Company, Inc., Appellants,

v.

Kymberly Benson **LIFSHUTZ**, Appellee.

No. 04–05–00117–CV.

Court of Appeals of Texas, San Antonio.

April 26, 2006.

Rehearing Overruled June 29, 2006.

From the 150th Judicial District Court, Bexar County, Texas, Trial Court No. 97–CI–13199; Michael Peden, Judge Presiding.[1]

Ellen B. Mitchell, Cox Smith Matthews Inc., and James M. Pearl, Casseb & Pearl, Inc., Richard R. Orsinger, McCurley, Orsinger, McCurley, Nelson & Downing, Cheryl L. Wilson, Wilson & Pennypacker, L.L.P., San Antonio, for appellants.

Sam C. Bashara, Law Offices of Sam C. Bashara, San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, SARAH B. DUNCAN, Justice, REBECCA SIMMONS, Justice.

**OPINION**

Opinion by ALMA L. LÓPEZ, Chief Justice.

This is the second appeal relating to the divorce between James Lifshutz and Kymberly Benson Lifshutz. *See Lifshutz v. Lifshutz*, 61 S.W.3d 511 (Tex.App.-San Antonio 2001, pet. denied). In this appeal, James presents five issues asserting: (1) the trial court punished James when it reconsidered the property division on remand; (2) the trial court erred in finding that the stock of Berlee Lumber Company,

1. Associate Judge Richard Garcia presided over the underlying proceedings and entered the judgment and the findings of fact and conclusions of law. The Honorable Michael Peden adopted Judge Garcia's recommendations.

Inc. was distributed to James and his brothers before being contributed to Liberty Financial Corporation; (3) the evidence is insufficient to support the trial court's finding that the community estate was entitled to a *Jensen*[2] reimbursement; (4) the trial court abused its discretion in awarding Kymberly attorneys' fees; and (5) the property division is not just and right. Liberty Financial Corporation, Liberty Properties Partnership, Texas Home Improvements, Inc., and Berlee Lumber Company, Inc. (the "Entities") are entities owned directly or indirectly by James and his brothers. The Entities filed a separate appeal contending: (1) the evidence is legally and factually insufficient to support the trial court's finding that James did not breach his fiduciary duty; (2) the trial court violated the law of the case and the scope of the remand by making a finding of alter ego on remand, the evidence is legally insufficient to support the alter ego finding, and alter ego is not a defense to the breach of fiduciary duty claim; (3) the evidence is legally and factually insufficient to support the trial court's findings of ratification and actual and apparent authority. We overrule James's issues relating to both the trial court's punishing him on remand and the distribution of the Berlee stock. We sustain James's issue relating to the *Jensen* reimbursement claim. We sustain the Entities' issues and reverse the trial court's judgment as to the Entities' breach of fiduciary duty claim. Because liability as to the breach of fiduciary duty claim was contested and damages are unliquidated, we remand the breach of fiduciary duty claim to the trial court for further proceedings consistent with this opinion. "Any change in the trial court's judgment on liability or damages for breach of fiduciary duty could potentially result in a loss of property from both the community estate and Kymberly's separate estate. Because of this possibility, the property division must be remanded, including the award of attorney's fees." *Lifshutz I*, 61 S.W.3d at 518. Accordingly, we need not address James's fourth and fifth issues.

## BACKGROUND

James and Kymberly were married in 1990 and separated in 1997. During the marriage, James managed the business of each of the Entities. The Entities paid various personal expenses for James and Kymberly, including a $95,000 addition to their home. The Entities were primarily involved in real estate, including the purchase and collection of notes and rental real estate. During the marriage, James purchased notes and rental real estate for the personal benefit of James and Kymberly.

During the divorce proceedings, Kymberly sought to pierce the corporate veil of the Entities so that James's interest in the Entities would be included as a community property asset. The Entities filed a breach of fiduciary duty claim against James seeking damages for the personal expenses the Entities paid on his behalf and a constructive trust or damages for the business opportunities James usurped for the personal benefit of James and Kymberly. Following a bench trial, the trial court found James had breached his fiduciary duty but denied the Entities' claim for damages or a constructive trust based on the trial court's alter ego finding. Because the trial court found alter ego, it increased the community estate by the amount of James's interest in the Entities.

In the first appeal, we held that "the trial court improperly pierced the corporate entities" because the evidence was

2. *See Jensen v. Jensen,* 665 S.W.2d 107 (Tex. 1984).

legally insufficient to support a finding of alter ego in a divorce case. *Lifshutz*, 61 S.W.3d at 518. We further held that the trial court improperly pierced Liberty Properties Partnership because it was a partnership. *Id.* Because the trial court denied damages for the Entities' breach of fiduciary duty claim based on its alter ego finding, we "reverse[d] and remand[ed] for [a] new trial on breach of fiduciary duty and the division of community property." *Id.* at 519. In the opinion, we noted, "If the evidence supports a finding that James was undercompensated for his time and talent spent increasing the value of his separate interests, Kymberly may have a claim for reimbursement to the community." *Id.* at 518 n. 5.

On remand, the trial court reviewed the evidence developed at the original trial along with bank statements regarding the funds received from the sale of James's carried interest in Hotel Partners. The trial court found that one-third of the stock in Berlee was distributed to James by Liberty Properties Partnership and then recontributed to Liberty Financial Corporation, making the stock a community property asset. The trial court further found that James was undercompensated and that the community estate was entitled to reimbursement. Finally, the trial court found that the breach of fiduciary duty claim should be denied because: (1) the claim is not just; (2) James is the alter ego of the Entities; (3) any diversion of corporate opportunities was ratified through agreement, consent, or acquiescence or James had actual or apparent authority to divert the opportunities.

## STANDARD OF REVIEW

When a complete reporter's record is filed, the trial court's fact findings may be reviewed for legal and factual sufficiency under the same standards as jury verdicts. *David L. Smith & Assocs., L.L.P. v. Advanced Placement Team, Inc.*, 169 S.W.3d 816, 819 (Tex.App.-Dallas 2005, pet. filed); *Min v. Avila*, 991 S.W.2d 495, 500 (Tex.App.-Houston [1st Dist.] 1999, no pet.). We do not review a trial court's conclusions of law for factual sufficiency. *David L. Smith & Assocs., L.L.P.*, 169 S.W.3d at 819. Rather, we evaluate the conclusions independently, determining whether the trial court correctly drew the legal conclusions from the facts. *Id.* Incorrect conclusions of law will not require a reversal if the controlling findings of fact will support the judgment under a correct legal theory. *Id.*

When a party not bearing the burden of proof on an issue challenges the legal sufficiency of the evidence, we review the evidence in the light most favorable to the verdict giving "credit [to] favorable evidence if reasonable jurors could, and disregard[ing] contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex. 2005). Evidence is legally insufficient when the record discloses: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810.

When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, the party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001). In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all

evidence to the contrary. *Id.* If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* The point of error should be sustained only if the contrary proposition is conclusively established. *Id.*

When a party not bearing the burden of proof on an issue attacks the factual sufficiency of the evidence, we examine the entire record to determine whether there is some probative evidence to support the jury finding, after which we determine whether the evidence supporting the finding is so weak or so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Potter v. GMP, L.L.C.,* 141 S.W.3d 698, 702 (Tex.App.-San Antonio 2004, pet. dism'd). When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, the party must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Id.* at 242. The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.* In doing so, the court of appeals must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Id.*

In making a just and right division of the community estate, broad discretion is given to the trial court, and the division will not be reversed on appeal unless the complaining party shows that the trial court clearly abused its discretion. *Murff v. Murff,* 615 S.W.2d 696, 698 (Tex. 1981). The test for whether the trial court abused its discretion is whether the court

acted arbitrarily or unreasonably. *Alsenz v. Alsenz,* 101 S.W.3d 648, 655 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). When a court mischaracterizes separate property as community property, the error requires reversal because the subsequent division divests a spouse of his or her separate property. *Sheshtawy v. Sheshtawy,* 150 S.W.3d 772, 780 (Tex.App.-San Antonio 2004, pet. denied).

## ENTITIES' APPEAL

### A. Establishment of Breach of Fiduciary Duty

In their first issue, the Entities contend that they conclusively established their entitlement to relief on their claim for breach of fiduciary duty or, in the alternative, denial of relief was against the great weight and preponderance of the evidence. In addressing this issue, the Entities initially focus on the evidence supporting their claim and separately address the possible defenses. Kymberly's brief, on the other hand, focuses on the evidence supporting the defenses to recovery rather than challenging whether the evidence was sufficient to support a finding that James did not breach his fiduciary duty.

Corporate officers owe fiduciary duties to the corporations they serve. *Grinnell v. Munson,* 137 S.W.3d 706, 718 (Tex.App.-San Antonio 2004, no pet.). A corporate fiduciary is under an obligation not to usurp corporate opportunities for personal gain, and equity will hold him accountable to the corporation for his profits if he does so. *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 577 (Tex.1963). The Texas Supreme Court has long recognized "as a matter of common law that '[t]he relationship between ... partners ... is fiduciary in character, and imposes upon all the participants the obligation of loyalty to the joint

concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise'" *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 545 (Tex.1998) (quoting *Fitz–Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 264 (1951)). As a fiduciary, a partner is under the same obligation as a corporate fiduciary not to usurp corporate opportunities. *See Holloway*, 368 S.W.2d at 577.

After reviewing the record, we hold that the evidence conclusively established as a matter of law that James diverted opportunities from the Entities for personal gain, including interests in notes and rental properties.[3] The testimony was undisputed that the Entities were engaged in the acquisition of rental properties which is what the Hutchins Palms and San Jacinto projects entailed. These projects came to James's attention at the offices he used in managing the Entities. James did not offer these opportunities to the Entities before acquiring them for the personal benefit of James and Kymberly. Even more egregious, the undisputed evidence shows that James selected the notes that would be purchased for his personal benefit from those purchased by the Entities so that the notes purchased for his personal benefit were the notes with the highest rates of return or yields and with the least risk of default. The only project in which the Entities did not previously engage was the Hotel Partners project; however, the fact that the Entities purchased a 10% interest while James personally benefited by receiving a 10% carried interest is sufficient to support a breach of fiduciary duty regarding this opportunity. Rather than engage in the services enabling James to receive a carried interest on behalf of the Entities, he elected to engage in those services on his own behalf to personally receive the carried interest.

## B.  Alter Ego/Sham

In their second, third, and fourth issues, the Entities challenge the trial court's alter ego finding. The Entities contend that the finding violates the law of the case and exceeds the scope of the remand. The Entities further contend that the evidence is legally insufficient to support the finding and that alter ego is not a defense to a breach of fiduciary duty claim.

Kymberly argues that *Lifshutz I* drew a distinction between a finding of alter ego and the remedy of piercing the corporate veil. Accordingly, Kymberly believes that the trial court was not precluded from entering an alter ego finding on remand and relying on that finding in denying the breach of fiduciary duty claims. Kymberly further argues that if this court were to impose a constructive trust as a remedy for breach of fiduciary duty, the second requirement for piercing the corporate veil would be established because the community estate would be damaged. Finally, Kymberly contends that the trial court properly denied the breach of fiduciary duty claim because no true adversity existed between the Entities and James; therefore, the claim was a sham.

In *Lifshutz I*, this court asserted, "The doctrine of alter ego, in a traditional business context, allows the trial court to set aside the corporate structure of a company, or 'pierce the corporate veil,' to hold individual shareholders liable for corporate

---

**3.** We note that the trial court impliedly found that James breached his fiduciary duty in expressly finding that "if judgment were granted to the Third–Party corporate Defendants as requested, part of the conduct which established the alter ego finding, i.e., the usurpation of corporate opportunities to the community and the use of corporate assets to pay for community expenses, would result in harm to the community...."

debt." 61 S.W.3d at 516. This court then distinguished between the application of the principles of alter ego and piercing the corporate veil in the traditional business context and the divorce context. *Id.* at 516–17. This court noted that in exceptional circumstances, the principles of alter ego and piercing the corporate veil have been applied in divorce cases in what could be termed "reverse piercing." *Id.* at 516. "Piercing the corporate veil in a divorce case allows the divorce court to characterize as community property corporate assets that would otherwise be the separate property of one spouse .... [and] allows the trial court to move assets out of the corporation and divide them between spouses as part of the shareholder's community estate." *Id.* This court then concluded:

> At the least, a finding of alter ego sufficient to justify piercing in the divorce context requires the trial court to find: (1) unity between the separate property corporation and the spouse such that the separateness of the corporation has ceased to exist; and (2) the spouse's improper use of the corporation damaged the community estate beyond that which might be remedied by a claim for reimbursement.

*Id.* at 517.

Kymberly argues that the first requirement relates only to a finding of alter ego, and the second requirement relates only to a finding that the corporate veil should be pierced. Since this court deferred to the trial court's implied finding on the first requirement in *Lifshutz I*, Kymberly asserts that *Lifshutz I* actually "embraces" the trial court's finding of alter ego on remand.

We agree with the Entities' argument that reliance on the alter ego finding on remand was precluded by the law of the case and the scope of the remand.

"The 'law of the case' doctrine is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex.1986). "By narrowing the issues in successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency." *Id.* "The doctrine is based on public policy and is aimed at putting an end to litigation." *Id.* "The doctrine of the law of the case only applies to questions of law and does not apply to questions of fact." *Id.* A determination by an appellate court that the evidence is legally insufficient to support a finding involves a question of law and falls within the ambit of the "law of the case" doctrine. *Lee v. Lee,* 44 S.W.3d 151, 153 n. 5 (Tex.App.-Houston [1st Dist.] 2001, pet. denied).

"When [an appellate court] remands a case and limits a subsequent trial to a particular issue, the trial court is restricted to a determination of that particular issue." *Hudson,* 711 S.W.2d at 630. "Thus, in a subsequent appeal, instructions given to a trial court in the former appeal will be adhered to and enforced." *Id.* "In interpreting the mandate of an appellate court, however, the courts should look not only to the mandate itself, but also to the opinion of the court." *Id.*

In *Lifshutz I,* we sustained the Entities' issues "regarding alter ego and piercing." 61 S.W.3d at 518. In addressing the breach of fiduciary duty claim, we noted that the trial court did not award damages "based on its holding that the [Entities] were the alter ego of James." *Id.* at 519. Because we reversed the alter ego finding, we concluded that the finding was an improper basis for the trial court to deny damages. *Id.* We noted, however, that other grounds were pled on which the

damages could have been denied. *Id.* Since those grounds were not considered by the trial court, we concluded that the trial court would need to reconsider whether to award damages. *Id.* Since the damages were unliquidated and liability was contested, we remanded the entire issue relating to the breach of fiduciary duty claim to the trial court. *Id.*

The law of the case and the limited scope of the remand in this case precluded the trial court from relying on the theory of alter ego as a basis to deny damages for the breach of fiduciary duty claim. Accordingly, each of the following findings by the trial court as a reason for denying the Entities' breach of fiduciary duty claim was improper:

> The Court finds the claims by Third–Party Defendants against JAMES G. LIFSHUTZ and KYMBERLY BENSON LIFSHUTZ are not just and should be denied.
>
> The Court finds that the Third–Party corporate Defendants are the alter ego of JAMES G. LIFSHUTZ.
>
> The Court finds that if judgment were granted to the Third–Party corporate Defendants as requested, part of the conduct which established the alter ego finding, i.e., the usurpation of corporate opportunities to the community and the use of corporate assets to pay for community expenses, would result in harm to the community and KYMBERLY BENSON LIFSHUTZ'S separate property estate, which would require piercing the corporate veil in order to avoid an inequitable result.
>
> The Court finds that there is no true adversity between any of the Third–Party Defendants and JAMES G. LIFSHUTZ.
>
> The Court finds that the Third–Party Defendants' claims against JAMES G. LIFSHUTZ and KYMBERLY BENSON LIFSHUTZ are invalid since they are merely alter ego of JAMES G. LIFSHUTZ.
>
> The court finds that the Third–Party Defendants are all controlled by JAMES G. LIFSHUTZ, who sought to use the Third-party entities to advance as real an illusory and sham claim.

## C. Ratification

The trial court found that the Entities ratified both the diversion of corporate opportunities and the improper payment of personal expenses through agreement, consent, or acquiescence.

Transactions between corporate fiduciaries and their corporation are capable of ratification by the shareholders or, as occurs more commonly, by the board of directors' specific approval or acquiescence, laches, or acceptance of benefit. *General Dynamics v. Torres,* 915 S.W.2d 45, 50 (Tex.App.-El Paso 1995, writ denied); *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.,* 779 S.W.2d 474, 478 (Tex.App.-El Paso 1989, writ denied). Ratification by any means, however, is effective only when the officer has fully disclosed all material facts of the transactions to the board of directors or shareholders. *Torres,* 915 S.W.2d at 50.

In *Dyer,* the El Paso court held that "even when the transaction is detrimental to the corporation, no cause of action will lie if all of the shareholders have ratified the transaction." 779 S.W.2d at 478. In *Torres,* however, the El Paso court held that there can be no ratification of an act that is not done on behalf of the corporation. 915 S.W.2d at 50. The El Paso court stated, " '[R]atification can only be effectual between the parties involved when the [fiduciaries'] act is done openly and admittedly for the [corporation], and not when done for the [fiduciaries'] bene-

fit....'" *Id.* (quoting *Herider Farms–El Paso, Inc. v. Criswell,* 519 S.W.2d 473, 477–78 (Tex.Civ.App.-El Paso 1975, writ ref'd n.r.e.)). The El Paso court concluded, "We believe it to be the rule in Texas that ratification is not available to condone a corporate officer or director's disloyalty or fraud." *Id.* at 51.

■■■ If we assume that a breach of fiduciary duty can be ratified, there is no evidence of full disclosure to the other shareholders. Indeed, the evidence establishes that no disclosure was made. Accordingly, the trial court erred in finding that the Entities ratified James's breach based on the usurpation of business opportunities.

■■■ With regard to the payment of personal expenses, however, the evidence establishes that the shareholders were on notice that these expenses were being paid by the Entities. In fact, one of James's brothers received similar benefits, and the father's personal expenses had been paid through the Entities for years. Accordingly, the evidence supports the trial court's finding that James's actions with regard to the payment of personal expenses had been ratified.

### D.  Actual and Apparent Authority

The trial court found "that JAMES G. LIFSHUTZ had actual and apparent authority to use corporate and partnership assets as his own."

The Entities contend that the evidence is insufficient to establish that James had actual or apparent authority. The Entities assert, "There is no evidence that any entity intentionally authorized the misuse of its assets, either by word or conduct. There is no evidence of a resolution by any corporate board of directors, or any agreement of the shareholders or partners." The Entities further assert that apparent authority extends only to conduct that is apparently for the purpose of carrying out the entity's business.

■■■ The law does not presume agency. *Suarez v. Jordan,* 35 S.W.3d 268, 272 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *Disney Enterprises, Inc. v. Esprit Finance, Inc.,* 981 S.W.2d 25, 30 (Tex. App.-San Antonio 1998, pet. dism'd w.o.j.). The individual alleging agency has the burden to prove its existence. *Disney Enterprises, Inc.,* 981 S.W.2d at 30. Absent actual or apparent authority, an agent cannot bind a principal. *Id.*

■■■ Both actual and apparent authority are created through conduct of the principal communicated either to the agent (actual authority) or to a third party (apparent authority). *Suarez,* 35 S.W.3d at 272; *Disney Enterprises, Inc.,* 981 S.W.2d at 30. Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess. *Id.; Disney Enterprises, Inc.,* 981 S.W.2d at ·30. Apparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority. *Insurance Co. of North America v. Morris,* 981 S.W.2d 667, 672 (Tex.1998). Certain limitations apply in determining whether apparent authority exists. *Suarez,* 35 S.W.3d at 272. First, apparent authority is determined by looking to the acts of the principal and ascertaining whether those acts would lead a reasonably prudent person using diligence and discretion to suppose the agent had the authority to act on behalf of the principal. *Suarez,* 35 S.W.3d at 272; *Disney Enterprises, Inc.,* 981 S.W.2d at 30. Only the conduct of the principal may be considered; representations made by the agent of his authority

have no effect. *Suarez*, 35 S.W.3d at 272; *Disney Enterprises, Inc.*, 981 S.W.2d at 30. Second, the principal must either have affirmatively held the agent out as possessing the authority or the principal must have knowingly and voluntarily permitted the agent to act in an unauthorized manner. *Suarez*, 35 S.W.3d at 272. Finally, a party dealing with an agent must ascertain both the fact and the scope of the agent's authority, and if the party deals with the agent without having made such a determination, she does so at her own risk. *Suarez*, 35 S.W.3d at 272; *Disney Enterprises, Inc.*, 981 S.W.2d at 30.

■ There is no evidence in the record that the Entities intentionally conferred on James the authority to usurp business opportunities, took any action that would enable James to believe he had the authority to usurp business opportunities, or failed to exercise ordinary care thereby allowing James to believe he had authority. With regard to apparent authority, apparent authority exists "where the principal's conduct would lead a reasonably prudent person to believe that the agent possessed the authority *to act on behalf of the principal*." *Disney Enterprises, Inc.*, 981 S.W.2d at 30. This concept does not apply in this context where clearly James was not acting on behalf of the Entities. Accordingly, the trial court erred in finding that James had actual or apparent authority to use corporate and partnership assets as his own.

**E.  Conclusion as to Entities' Appeal**

The evidence conclusively established that James breached his fiduciary duty in usurping the business opportunities of the Entities. The trial court erred in ignoring the law of the case and the scope of the remand in denying relief on the basis of alter ego, no true adversity, and sham. The evidence is insufficient to support the

trial court's findings that the Entities ratified James's actions or that he had actual or apparent authority to engage in the wrongful acts. Because liability as to the breach of fiduciary duty claim was contested and damages are unliquidated, we remand the breach of fiduciary duty claim to the trial court for further proceedings consistent with this opinion. *See* TEX.R.APP. P. 44.1(b).

## JAMES'S APPEAL

**A.  Award of Greater Percentage of Property to Kymberly**

■ In his first issue, James contends that the trial court "improperly disregarded" our opinion in *Lifshutz I* and "punished James by awarding even more property to Kymberly than it awarded under the first, erroneous judgment." James appears to contend that because we rejected Kymberly's complaints regarding the nature of the property division in *Lifshutz I,* the trial court erred in changing its division on remand. In *Lifshutz I,* however, we expressly remanded the division of community property to the trial court for reconsideration. 61 S.W.3d at 519. James cites a criminal case to support the contention that because no new evidence was presented, the trial court could not "punish" him on remand by changing the property division. Because this court remanded the cause to the trial court to reconsider the property division, the trial court did not ignore the *Lifshutz I* decision or violate any legal principal in following this court's instructions on remand to reconsider the property division. *See Hudson,* 711 S.W.2d at 630 (noting instructions given in former appeal will be adhered to and enforced).

**B.  Distribution of Berlee Lumber Company Stock**

■ In his second issue, James challenges the finding by the trial court "that

1/3 of the stock of Berlee Lumber Company was distributed by Liberty Partnership to JAMES G. LIFSHUTZ as a non liquidating community distribution and then recontributed by JAMES G. LIFSHUTZ to Liberty Financial during the reorganization and reimbursement was therefore due the community estate." In the final divorce decree, the trial court further found, "that the distribution of Berlee stock should be and is hereby characterized as community property and when contributed by JAMES G. LIFSHUTZ to his separate corporate entities, JAMES G. LIFSHUTZ' separate estate was enhanced between $1,100,000.00–$1,780,630.00."

The evidence presented on this issue is conflicting. In 1990, Liberty Properties Partnership appeared to have acquired the stock of Berlee Lumber Company from Barnard Lifshutz, James's father. Although there is conflicting evidence with regard to the recording of this transfer in the stock book, the remainder of the evidence appears to support a finding that the stock was transferred to Liberty Properties Partnership. In 1996, the Berlee stock was transferred from Liberty Properties Partnership to Liberty Financial Corporation. The trial court found that this transfer resulted in a distribution from the partnership to James, causing it to become a community property asset before it was then recontributed to Liberty Financial Corporation.

Kymberly called several experts in both legal and accounting or tax fields who testified that the transfer caused a distribution to James. James called several experts who testified to the contrary.

Janet E. Stigent–Burns, a certified public accountant, stated she reviewed the 1996 tax return, including the K1, financial statements, general ledgers, work paper entries, and various items in the minute book, corporate records, and partnership records. The 1996 partnership return showed a distribution to the partners consisting of the Berlee stock, a note receivable from Texas Home Improvement, and various cash distributions. Burns characterized the distribution as community property. Burns testified that the value of the distribution of Berlee stock was $1,108,348.00. On cross-examination, Burns stated that she was unaware of another way the transaction could be documented for tax purposes if the transfer was direct from Liberty Properties Partnership to Liberty Financial Corporation. Burns stated that the direct transfer could not be accomplished without a deemed or constructive distribution to James and his brothers. Burns also testified that the financial statement and tax return for Liberty Financial Corporation documenting the contribution of the Berlee stock and James's individual tax return contained entries that were inconsistent with a direct transfer.

Norman Seeman, a certified public accountant, prepared the tax returns for James and the Entities. Although Seeman agreed that the tax returns showed the Berlee stock as being distributed, Seeman stated that the "amount wasn't distributed. This amount was transferred to another corporation." Seeman later insisted that the Berlee stock was not distributed, stating:

> Don't use the word "distributed." You keep coming back—it wasn't distributed. This was part of a recapitalization. It was transferred from one company to the other. You keep saying distributed, and it wasn't distributed.

Seeman testified that he did not intend the entries to reflect a distribution but a direct transfer of the Berlee stock from the partnership to the corporation.

Peter Wolverton, a tax attorney with a masters in taxation, reviewed the tax re-

turns of Liberty Properties Partnership and Liberty Financial Corporation. Wolverton stated that the partnership reported the transaction as a distribution of Berlee stock to James and his brothers. Wolverton further testified that Liberty Financial treated the transaction as a contribution to capital by James and his brothers to Liberty Financial. Wolverton stated that if Berlee had transferred the stock to Liberty Financial directly and thereby became a shareholder, the transaction would have resulted in a $3,000,000 taxable gain. If the stock was transferred directly and Berlee did not become a shareholder as part of a tax reorganization, the Berlee stock would have a zero basis, and Liberty Financial would not be able to deduct any losses with regard to that asset. Wolverton stated that the fair market value of Berlee at the time of transfer was $3,400,000.00.

Stanley Blend, a tax attorney, testified that in planning the reorganization, the Berlee stock was to be transferred from the partnership to the corporation. Blend agreed that for federal income tax purposes, the transfer of the stock was shown as a distribution to the partners; however, Blend asserted that it could have been shown as a direct investment. Blend stated that the stock certificates reflected that the ownership was transferred from the partnership to the corporation under Texas substantive law.

William Bradley, a certified public accountant, testified that the tax returns contained one acceptable way in which the direct transfer of the stock could be reported; however, other methods could also have been used. Bradley agreed that the direct transfer would "possibly" require the Berlee stock to be reflected on Liberty Financial's books with a zero basis.

James relies on *Thomas v. Thomas*, 738 S.W.2d 342 (Tex.App.-Houston [1st Dist.]

1987, writ denied), to support his position. In *Thomas*, a spouse was claiming that retained earnings in a Subchapter S corporation should be considered marital property because the income of Subchapter S corporations is treated as the personal income of the shareholders for tax purposes. 738 S.W.2d at 343–44. The court noted that Subchapter S status does not determine who owns the corporation's earnings but merely provided an alternative method to tax the corporation's income. *Id.* at 344. "A Subchapter S corporation may distribute its income, but, like any other corporation, it is not required to do so. Corporate distributions, regardless of form, are controlled by state law." *Id.* The court agreed with the unanimous holding of the courts in community property states that "corporate earnings remained corporate property until distributed and, therefore, were not divisible on divorce." *Id.* at 344.

*Thomas* would be more on point if Liberty Properties Partnership had retained its interest in the Berlee stock. In that case, the Berlee stock would be a retained partnership asset and would not be a part of the community property estate. The distinction in this case is that the Berlee stock was undisputedly transferred, and the question is whether it resulted in a distribution to James.

Kymberly relies on *Marshall v. Marshall*, 735 S.W.2d 587 (Tex.App.-Dallas 1987, writ ref'd n.r.e.), to support her position. In *Marshall*, the husband owned a separate property interest in a partnership. The partnership engaged in oil and gas exploration and production. *Id.* at 594. The partnership acquired all of its oil and gas leases before the marriage. *Id.* The partnership disbursed $542,315.72 to the husband during the marriage. *Id.* The husband maintained that only the $22,400.00 paid as salary was community

property. *Id.* The court rejected the husband's argument and held that the distributions of partnership income or profits were community property. *Id.* at 595.

In view of *Marshall,* James argues that the distribution in this case was an asset distribution and not a profit distribution; therefore, James contends that *Marshall* is not controlling. In *Marshall,* the court noted:

> [A] withdrawal from a partnership capital account is not a return of capital in the sense that it may be characterized as a mutation of a partner's separate property contribution to the partnership and thereby remain separate. Such characterization is contrary to the UPA and implies that the partner retains an ownership interest in his capital contribution. He does not; the partnership entity becomes the owner, and the partner's contribution becomes partnership property which cannot be characterized as either separate or community property of the individual partners. Thus, there can be no mutation of a partner's separate contribution; that rule is inapplicable in determining the characterization of a partnership distribution from a partner's capital account.

735 S.W.2d at 594. Whether the distribution was of an asset or cash, the distribution was from the capital account to which *Marshall* states that the "mutation of a partner's separate contribution" does not apply. As one commentator has explained:

> As with trusts, a partnership can be an effective means of preserving the separate property character of assets contributed to the partnership and the undistributed income thereon. The partner's spouse does not have an interest in the assets of the partnership until the assets and profits are actually distributed to the partner either in the

form of partnership income or return of capital. To the extent that income distributions are made from the partnership, the distributions will be characterized as community property. Further, to the extent that distributions from the partnership include a return of the partner's separate capital contribution, the distribution will be characterized as community income because the partnership entity becomes the owner of the capital contribution. Thus, no mutation of the partner's separate property contribution occurs. Essentially, the rule of mutation of separate property is inapplicable in characterizing a partnership distribution from a partner's capital account.

Lisa H. Jamieson, *Marital Property Issues in the Modern Estate Plan,* 49 Baylor L.Rev. 391, 402 (1997) (citing *Marshall*).

Even if we accept that the manner in which a transaction is documented for tax purposes is not controlling, it still must be considered as some evidence. Furthermore, although traditionally the stock book of a corporation might be decisive with regard to the manner in which stock ownership was transferred, evidence was presented in this case that could cause the trial court to question the validity of the stock book to accurately reflect the conveyance of the corporate stock. There was evidence that when the stock book was reviewed in 1993, it did not reflect the conveyance of the Berlee stock to Liberty Properties Partnership in 1990 although a subsequent review of the stock book revealed certificates dated in 1990. The trial court could have found that in light of that evidence, the stock book was not credible evidence of the manner in which the Berlee stock was conveyed because the stock certificates could be created at any time and back dated. Accordingly, the evidence

is sufficient to support the trial court's finding that a distribution occurred.

Texas has adhered to the entity theory of partnership since the Texas Uniform Partnership Act was enacted in 1961. *See Haney v. Fenley, Bate, Deaton & Porter*, 618 S.W.2d 541, 542 (Tex.1981); *Burnap v. Linnartz*, 914 S.W.2d 142, 150 (Tex.App.-San Antonio 1995, writ denied). Under the entity theory, all property brought into the partnership is partnership property and, as partnership property, does not retain either a community or separate property nature. *See Harris v. Harris*, 765 S.W.2d 798, 804 (Tex.App.-Houston [14th Dist.] 1989, writ denied). "This is an area in which the community property principles and the Texas version of the Uniform Partnership Act conflict." 38 ALOYSIUS A. LEOPOLD, TEXAS PRACTICE: MARITAL PROPERTY AND HOMESTEADS § 7.10 (1993). "[W]hen an individual partner contributes property into a partnership, the partner loses individual interest in the property and, since the partnership itself is the new owner, the property can no longer be classified as separate or community." *Id.* at § 4.10. Accordingly, since partnership property does not retain a separate character, distributions from the partnership are considered community property, regardless of whether the distribution is of income or of an asset.[4] *Marshall*, 735 S.W.2d at 594.

James further contends that if the trial court did not err in finding that a distribution had occurred, it erred in failing to apply a minority discount in valuing James's 1/3 interest. Again, the evidence is conflicting on whether a minority discount should apply. James's expert testified that no minority discount would apply because:

> The time when the Burlee [sic] Lumber Company stock was a minority interest was instantaneous, at best, and according to Mr. Pearl [Berlee's attorney], it never happened because it went—immediately became part of the capital of Liberty Finance [sic]. Under those circumstances, the number of cases which indicate whether you look at the entire transaction, there would never be a minority or marketability discount because 100% of the stock of the company was together and is still together.

Because it is within the trial court's province to weigh the credibility of the witnesses and the weight to be given their testimony, the evidence is legally and factually sufficient to support the trial court's finding that a minority discount was not applicable.

## C. Reimbursement for Undercompensation

In his third issue, James challenges the trial court's finding that "JAMES G. LIFSHUTZ was under compensated and that the Jensen Claim of KYMBERLY BENSON LIFSHUTZ should be granted." In the final divorce decree, the trial court ordered "that KYMBERLY BENSON LIFSHUTZ' *Jensen* reimbursement claim be and it is hereby granted in the total amount of $492,835.00."

---

4. We recognize that a Louisiana appellate court has drawn a distinction between distributions of income and distributions of a capital asset. *Guilott v. Guilott*, 361 So.2d 1271, 1276–77 (La.Ct.App.1978, writ denied). In *Guilott*, however, the court did not analyze the effect of the entity theory of partnerships in concluding that a distribution of the capital assets of the partnership, as distinguished from fruits or earnings, was the wife's separate property. We further note that Wolverton testified that the accumulated profits in Liberty Properties exceeded the aggregate distributions, which included the Berlee stock distribution.

Texas has adopted the reimbursement theory with regard to the manner in which to treat, upon divorce, increases in the value of corporate stock during the marriage where the corporate stock is the separate property of one spouse. *Jensen v. Jensen,* 665 S.W.2d 107, 109 (Tex.1984). The reimbursement theory provides that the stock, as it appreciates, remains the separate property of the owner spouse. *Id.* Under this theory, the community is entitled to reimbursement for the reasonable value of the time and effort of both or either of the spouses which contributed to the increase in the value of the community stock. *Id.* Accordingly, the community is required to be reimbursed for the value of time and effort expended by either or both spouses to enhance the separate estate of either, ***other than that reasonably necessary to manage and preserve the separate estate,*** less the remuneration received for that time and effort in the form of salary, bonus, dividends and other fringe benefits, those items being community property when received. *Id.* (emphasis added). In *Lifshutz I,* we noted that "[i]f the evidence supports a finding that James was undercompensated for his time and talent spent increasing the value of his separate interests, Kymberly may have a claim for reimbursement to the community." 61 S.W.3d at 518 n. 5.

As the party seeking reimbursement, Kymberly had the burden to prove the community estate was entitled to it. *Jensen,* 665 S.W.2d at 110; *Gutierrez v. Gutierrez,* 791 S.W.2d 659, 665 (Tex. App.-San Antonio 1990, no writ). While mathematical certainty is not required, there must be some proof of the value by which the time, toil and effort exceeded that necessary to manage and preserve the separate estate. *Gutierrez,* 791 S.W.2d at 665. The party seeking reimbursement must establish that the value of the time

and effort expended to enhance separate property exceeds both: (1) the time and effort reasonably necessary to manage and preserve his separate estate; and (2) the remuneration received from the corporation as compensation for that time and effort. *In re Marriage of Cassel,* No. 07–96–0268–CV, 1997 WL 260099, at *3 (Tex. App.-Amarillo May 19, 1997, no pet.). In order to establish that the efforts did more than was required to maintain the separate estate, evidence must be introduced to show the amount of time that was reasonably necessary for the party to spend managing and preserving the separate estate. *Gutierrez,* 791 S.W.2d at 665; *Thomas,* 738 S.W.2d at 345–46 (Dunn, J., concurring and dissenting).

In this case, Kymberly presented no evidence of the amount of time that was reasonably necessary for James to spend managing and preserving the Entities. In fact, Wolverton, one of the experts called to testify regarding the *Jensen* reimbursement, expressly declined to provide evidence regarding this element, responding to questions about this element as follows:

Q. What was the value of the time or effort reasonably necessary for him to manage his separate property interest in Liberty Properties?

A. I do not have an opinion about that.

Q. What was the value of the time or effort reasonably necessary for him to manage his one-third ownership in Liberty Financial?

A. I do not have an opinion on that.

Although Wolverton's testimony may have been sufficient to establish that James was undercompensated and that the value of the Entities increased as a result of James's efforts, Kymberly is not entitled to the enhanced value of the separate property, but only to the value of time, toil, and labor utilized to benefit the Entities beyond that which was reasonably neces-

sary for James to spend managing and preserving the Entities.

■ Kymberly appears to contend that the trial court could have made a determination of the value of the time that exceeded what was necessary to manage and preserve the separate property from the evidence that was presented. "We acknowledge that great latitude must be afforded the trial court in its application of equitable principles to value a claim for reimbursement." *In re Marriage of Cassel*, 1997 WL 260099, at *3. "Yet, the court's proper exercise of its discretion obtains only when its action is neither arbitrary or unreasonable, but is taken with reference to guiding rules and principles." *Id.* In this case, Wolverton could not give an opinion on the value of James's time or effort reasonably necessary for him to manage his separate property. James Park, the other expert who testified regarding the *Jensen* reimbursement claim, testified that the increased value or enhancement of the Entities was not attributable to the time and effort expended by James. Although "mathematical certainty" is not required, some evidence was required to be presented regarding the value of the time reasonably necessary to manage and preserve the separate property. *Gutierrez*, 791 S.W.2d at 665; *In re Marriage of Cassel*, 1997 WL 260099, at *3 (reversing trial court's finding regarding value of corporation based on figures provided by expert where expert testified that he did not have sufficient information to give an opinion on value). Because Kymberly did not meet her burden to present that evidence, the evidence was legally insufficient to support the trial court's award of the *Jensen* reimbursement.

### CONCLUSION

The evidence is sufficient to support the trial court's finding with regard to the distribution of the Berlee stock. The evidence is insufficient to support the *Jensen* reimbursement award. The trial court's judgment as to the Entities' breach of fiduciary duty claim is reversed. Because liability as to the breach of fiduciary duty claim was contested and damages are unliquidated, we remand the breach of fiduciary duty claim to the trial court for further proceedings consistent with this opinion. "Any change in the trial court's judgment on liability or damages for breach of fiduciary duty could potentially result in a loss of property from both the community estate and Kymberly's separate estates. Because of this possibility, the property division must be remanded, including the award of attorney's fees." *Lifshutz I*, 61 S.W.3d at 518.

Concurring opinion by SARAH B. DUNCAN, Justice.

SARAH B. DUNCAN, Justice, concurring.

The majority holds that the business reorganization by which Liberty Financial Corporation acquired the Berlee Lumber Company stock resulted in a legally cognizable distribution to James and thus can form the predicate for Kymberly's reimbursement claim. I disagree. The majority's holding promotes form over substance. Even if the form of the transfer could be interpreted as a distribution to James, it is only because that form was dictated by tax considerations. In substance, there was no distribution of the stock to James. The majority's holding thus "tend[s] to engraft upon our community property system the manifest complexities of federal tax law." *Thomas v. Thomas*, 738 S.W.2d 342, 345 (Tex.App.-Houston [1st Dist.] 1987, writ denied). And it wrongly injects into the entrepreneur's choice of a business organization form—usually guided by federal tax consequences and personal liability con-

cerns[1]—the irrelevant consideration of property characterization under Texas law. Because I would instruct the trial court that it could not consider the transfer of the Berlee stock as a basis for Kymberly's reimbursement claim, I concur in the judgment only.

---

**1.** *See generally* 19 ROBERT W. HAMILTON, TEXAS PRACTICE: BUSINESS ORGANIZATIONS §§ 31–38 (1973 & Supp.2002).