COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH



### NO. 02-09-00246-CV

KUV PARTNERS, LLC AND                                      APPELLANTS
EILAT, INC.

V.

WAEL FARES D/B/A                                          APPELLEE
FARES CONSTRUCTION

------------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION ON REHEARING[1]

------------

Upon consideration of appellant KUV Partners, LLC's motion for rehearing, we withdraw our opinion and judgment of December 31, 2010 and substitute the following to respond to an argument raised in the motion for rehearing.

In this appeal from a bench trial seeking damages and foreclosure of a materialman's lien for the construction of improvements to leased premises, appellants KUV Partners, LLC and Eilat, Inc. bring seven issues. They challenge the legal and factual sufficiency of the evidence to show that (1) KUV was part of a joint venture to develop the leased premises as a restaurant, (2) Nabil Dimassi,

------------

[1]*See* Tex. R. App. P. 47.4.

the sublessee of the leased premises, was an agent of KUV, (3) appellee Wael Fares d/b/a Fares Construction is entitled to recovery under a quantum meruit theory, and (4) appellee is entitled to recover damages from Eilat. They also challenge the trial court's conclusion that Fares perfected and was entitled to foreclosure of a materialman's lien on KUV's leasehold interest, its conclusion that KUV is liable under the lease agreement to satisfy Fares's materialman's lien, and its denial of a new trial or additional testimony based on newly discovered evidence. We reverse in part and affirm in part as modified.

**Background**

Javier Mondragon, an employee of Texas Palomina's restaurant in Arlington, Texas, met real estate investors Moshe Epstein and Mac Hargrove and asked them to find a restaurant for him to operate. Epstein found a property at 4421 South Freeway, Fort Worth, that had a Chinese buffet restaurant on it; he signed a lease with the owner on behalf of KUV,[2] in which he and Hargrove were the only members. KUV promised to pay $10,000 per month for a sixty-month initial term with an opportunity to extend the lease term. The lease also allowed KUV to sublease the premises to "the operating entity which will open the restaurant operations." The lease further provided that any tenant improvements would remain on the premises and become the property of the landlord at the expiration of the lease term. Epstein prepared a sublease of the premises to

_____

[2]The initial filing with the Texas Secretary of State showed the name as KUB Partners, LLC; the name was subsequently changed to KUV Partners, LLC, and they are the same company.

2

Mondragon, but Mondragon refused to sign it. Epstein then approached Nabil Dimassi, who owned the Arlington Texas Palomina's restaurant, among others. In June 2007, Dimassi signed a sublease with KUV for $15,000 a month for an initial sixty-month term. KUV agreed to pay for all "utilities, connection charges, maintenance . . . , and repairs" to the premises, as provided in its lease. Any subtenant improvements were required to comply with KUV's master lease.

In August or September 2007, Dimassi contracted with Wael Fares d/b/a Fares Construction to construct improvements in the leased premises for the new Texas Palomina's. According to Fares, Dimassi approved all of the work before it was started. Epstein was at the site almost daily during construction, and a man named David Goran started paying Fares instead of Dimassi himself. It was Fares's understanding from Epstein and Goran that Dimassi was in financial trouble. At Dimassi's request, Fares started presenting invoices to Goran's company, DFW AUCE, Inc. Eventually, Fares, Epstein, Hargrove, and Goran became aware that Dimassi had filed for personal bankruptcy.[3] At that point, Dimassi was in default to both KUV and Fares.

Fares stopped working at the site in November 2007 after he learned about the bankruptcy. KUV attempted to terminate Dimassi's sublease but could not do so because of the bankruptcy. Eventually, KUV purchased Dimassi's sublease from the bankruptcy trustee for $11,000 and then subleased the

---

[3]Unbeknownst to all, the other Texas Palomina's restaurants had been the subject of a corporate bankruptcy since that summer.

3

premises to Eilat, which is owned by Epstein's family. Eilat contracted with a third party to finish the work Fares had started and opened a restaurant in the space named Zorro's Buffet. Eilat also hired Dimassi as its general manager for the restaurant.

Fares filed a materialman's lien in February 2008. In March 2008, he sued Ngai, L.P.—the original owner of the premises and lessor under the master lease—KUV, and DFW AUCE for (1) vicarious liability for Dimassi's obligations under a single business enterprise, joint venture, partnership, or alter ego theory, (2) breach of contract, (3) quantum meruit, and (4) foreclosure of the materialman's lien. Fares later added Eilat as a defendant. After a bench trial before a visiting judge, that judge signed a judgment awarding Fares $155,387.34 in actual damages from KUV, DFW AUCE, and Eilat. It also awarded trial and conditional appellate attorney's fees and ordered foreclosure of Fares's materialman's lien "against the respective leasehold interests and improvements thereto of KUV . . . and its subtenant, Eilat" with the sale proceeds to be credited to payment of the judgment. KUV and Eilat appealed from the judgment, but DFW AUCE did not.

## Sufficiency Challenges

In the first, second, and fourth issues, KUV alleges that the evidence is legally and factually insufficient to support the trial court's findings and conclusions supporting the judgment against KUV under theories of vicarious liability, breach of contract, or quantum meruit. In the third issue, KUV and Eilat

4

challenge the sufficiency of the evidence to support the trial court's findings and conclusions that Fares perfected a valid materialman's lien against KUV's leasehold interest and Eilat's sublease interest in the property.

**Legal and Factual Sufficiency Standards of Review**

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, "*No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary to the overwhelming

5

weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

### Testimony

Because much of the evidence in the four-day trial is pertinent to all of the sufficiency issues, we will review it together.

#### Wael Fares

Fares testified that he owns a construction company doing business as Fares Construction. In 2007, Dimassi asked Fares if he would be interested in bidding on the "expansion" of Palomina's in Fort Worth; Fares visited the site and gave Dimassi a rough estimate. The two shook hands and Fares started the work.

The work started with the deposit of a $15,000 check written by Goran to Fares Construction or Dimassi. According to Fares, when he asked who Goran was, "they told me this is somebody from the landlord, they paying for the remodeling, and that would be the deposit check." Fares received various other amounts from Goran during construction; he also received some payments from Dimassi. In the middle of the project, Dimassi wanted the billing to be changed from his name to DFW AUCE. Fares said that he knew DFW AUCE was "presided by" Goran. The payments to Fares were either checks from Goran's personal account, checks from DFW AUCE, or cash from Dimassi or Goran.

6

Fares submitted all invoices to Dimassi, however, by hand delivering them to him onsite. Invoices admitted into evidence were addressed to either Dimassi, Texas Palomina's, or Goran at 4421 South Freeway.

Dimassi told Fares he leased the building. Fares testified that one day Epstein came by the site looking for Dimassi; Epstein told Fares that Dimassi's "landlord is here." When Fares confused him for Goran, Epstein said that Goran was Dimassi's "business partner," and Epstein was the landlord. When Dimassi arrived, Fares asked him who Epstein was, and Dimassi confirmed he was "one of the landlords." Fares learned after starting work on the premises that Ngai was the actual owner of the property and Dimassi was the sublessee.

Fares testified that when he was hired, he was sure he was working for Dimassi, but after the work started, he was not sure. He became confused because Epstein was "constantly there and involved." He saw Epstein up to six days a week at the site. However, Dimassi was the one to first meet with Fares and the subcontractors to discuss his vision for remodeling the leased premises. Dimassi did not provide any blueprints; he simply told Fares what he was envisioning in his mind. When asked who made the decisions regarding the aesthetic aspects of the building, Fares answered, "Primarily Mr. Dimassi, but has been [a] time when Mr. Goran or Mr. Epstein has given their thoughts, and I would say instructions to [Dimassi on] how things [should] be done, or discussed with the subcontractor, but primarily . . . Dimassi, yes." Fares testified that he

7

later learned from Dimassi that Goran was Dimassi's partner on this project in "some type of a franchise."

As specific examples, Fares testified that Goran wanted the bathrooms redone and had extensive discussions with Fares on how they should be redone. Goran also looked at carpet samples provided by Fares and instead went out and found a different carpet for Fares to order. Fares also testified that Epstein went with Fares's tile subcontractor to pick up the tile and pay for it. He also took the sneeze guard holder to Arlington to have it painted. According to Fares, Epstein "was . . . presiding on the site daily[;] always him and [Dimassi] on the side discussing things."

Fares said that when it was time to hook up utilities, Dimassi originally said they would be in the name of Palomina's. When the federal tax ID number for Palomina's was not satisfactory, Dimassi told Fares to put the utilities under the name of DFW AUCE, "the operating entity of that franchise." However, DFW AUCE's federal tax ID number did not work either, so Goran suggested putting the account under Epstein's information. Epstein agreed and provided his social security number for the account. Fares admitted on cross-examination that it was not his responsibility to facilitate the provision of the utilities to the premises and agreed that he was helping out by doing that because "it's helpful for the project for anyone to contribute to get that thing done."

Payment for the project fell behind. Epstein told him they needed to finish the project, and Fares would make jokes with Goran about when he would be

getting money. Fares talked to all three of them about the money; Epstein said that Dimassi was "choking" and they had to help him. He testified that Goran told him, "No matter what happen[s], I will sell cans and pay you."

Fares heard about Dimassi filing for bankruptcy in November 2007. He stopped work the first week of that month because of lack of payment. At the time, there was a $165,000 balance owed on the work. Fares testified that he did not perform any other work after that.

Fares had met Hargrove at the site one day and was introduced to him as Epstein's partner. Later, after Dimassi had declared bankruptcy, Fares met with Epstein and Hargrove, and they talked about how to save the restaurant. Fares discovered that the Palomina's restaurants were also in bankruptcy. Epstein and Hargrove discussed whether they could open the restaurant as Palomina's anyway and also discussed putting the lease in Goran's name. At a later meeting with Epstein and Hargrove and a woman named Laura, Epstein introduced Laura as follows, "She could be a potential partner with Goran in this venture" at 4421 South Freeway. When they asked how much it would cost to get the restaurant open, Fares told them $50,000, but then he said that he would not do the work until he was paid the $165,000 for the work he had already done. Epstein and Hargrove offered to pay him only for the cost to finish or to pay him out of revenue after they opened up the new restaurant, but Fares refused unless he also received all of the past due amounts.

9

A friend introduced Fares to Kaiss Alahmady in November 2007, and the two decided to look into buying Palomina's after the bankruptcy. They formed KNW Group in November 2007. Fares had contributed $100,000 to KNW Group and was a 15% minority member. KNW Group purchased the building from Ngai in August 2008 while the suit was pending.

At the time of trial, the restaurant had a sign for Zorro's Buffet on it. According to Fares, Eilat owned Zorro's; Epstein was the secretary, his wife was the president, and one of his sons was the treasurer. To the best of Fares's knowledge, there is still a lease to "Epstein, d/b/a KUV" with a sublease to Eilat. Fares had been to Zorro's; he knew that Dimassi and the Epsteins worked there in different capacities.

On cross-examination of Fares, the following exchange occurred:

Q. Do you know whether Dimassi and KUV had any common employees?

. . . .

A. Nobody I know.

Q. Do you know if Dimassi and KUV, during the course of this construction, had common offices?

A. Not to my knowledge.

Q. Mr. Dimassi and Eilat have common offices?

A. Not to my knowledge.

Q. Did Mr. Dimassi and KUV have common or centralized accounting?

A.     I have no access to know if they do or not, but nothing to my knowledge, no.

Q.     Did Dimassi or Eilat have any common or centralized accounting?

A.     I know he works for Eilat.

Q.     As an employee?

A.     I --

Q.     If you don't know, you don't know.

A.     No, I do know.  I'm trying to find the proper words without -- the previous counsel has testified he's a controlling member of Eilat. I don't know what that means.

       . . . .

Q.     . . . Did Mr. Dimassi ever pay the wages of employees of KUV or Eilat?

A.     I have no idea.  Not to my knowledge.  I mean, I don't know.

Q.     Did Mr. Dimassi have a common business name with KUV or Eilat?

A.     To the best of my knowledge, Eilat operate Zor[r]o Texas Buffet in Fort Worth at 4421 South Freeway, and Nabil Dimassi [is] the owner of the website, Zor[r]o Texas Buffet.  That much I can tell you.

Q.     The sign at 4421 South Freeway says what?

A.     Zorro's, the operating entity, Zorro's Buffet.

Q.     What does the sign say?

A.     I can't remember now, but I know it says Zorro's.

Q.     Did Mr. Dimassi ever have employees render services on behalf of KUV or Eilat?

11

A.     I can't -- I don't know.

Q.     Are you aware of any undocumented transfers of funds between KUV, Eilat, or Mr. Dimassi -- or Mr. Dimassi and KUV or Eilat?

A.     I do know from the testimony of Mr. Epstein under oath in the Northern Bankruptcy Court of Nabil Dimassi's personal bankruptcy, giving the detail that the cash money was paid to Mr. Epstein from the Palomina's in Arlington by Nabil and Nabil's associates.

Q.     And what was the -- what was the purpose of that payment?

A.     Different testimony lead to paying deposits, and the master lease and -- I don't know, but I do know, yes, there was exchange of money paid from Nabil and his associate to Mr. Epstein. Now, in his personal capacity, or KUV member, I cannot tell you.

Q.     Did KUV have an agreement to share profits or losses with Dimassi's proposed restaurant?

A.     I didn't see any.

Q.     Did Eilat have any agreement to share profits or losses of Dimassi's proposed restaurant?

A.     I didn't see any.

Q.     Did Dimassi and KUV ever express an intent to be partners?

A.     I'm not aware of that. I don't know.

Q.     Did Dimassi and Eilat ever express an intent to be partners?

A.     Not to me.

Q.     Did KUV or Eilat ever have a right to participate in Dimassi's restaurant at 4421 South Freeway?

A.     I don't know.

Q.     Did KUV or Eilat ever agree to contribute money or capital to Dimassi's restaurant?

12

A.     I don't know, except a meeting between KUV members both, Mr. Hargrove and Epstein, when they offered me money to continue working, they were going to change the name of the restaurant.  And the same party is still involved in that.

Q.     Did KUV or Eilat ever agree to contribute money or capital to Dimassi?

A.     I don't know.

Q.     Did KUV or Eilat have control over Dimassi?

A.     He is an employee of Eilat, but my witnessed experienced [sic], he ha[d] control over Eilat.

Q.     Did Dimassi ever perform any acts on behalf of KUV or Eilat?

A.     I think he acted on one incidence on behalf of KUV or Mr. Epstein, and he acted on behalf of Eilat, yes, doing something.

Q.     Specifically could you describe for the Court what instance you are referring with respect to?

A.     Okay.  If you don't get bored with the incident.  Back when the -- I started telling this story before -- when the bankruptcy ordered the locks to be changed and secure the building at 4421 South Freeway, the Judge ordered Fares Construction to pay for changing the locks, and we were ordered to go to 4421 South Freeway.

We went there with the representative of the trustee, Mr. Scott Sidel, with a gentleman named Lupe, myself representing Fares Construction, and Moshe Epstein was to represent KUV, and their attorney at the time, Irene Brush.

We get there, and I called the locksmith, and Fares Construction paid for changing the locks and giving the key to the trustee.  At that p[o]int, Mr. Dimassi was on the premises painting that same wall I had painted to conform with Palomina's.  He's repainting the walls, and he came out chasing me in the parking lot until the Court representative told him he need to step aside.  When we ask Mr. Epstein why he is there, he said he's representing him.

Q.     And what time frame was this?

13

A.    This was February 28, 2008 -- or 26th, 2008.  It's a Court order.

**Subcontractors**

Dale Karickhoff, president of Skyline Electric, a subcontractor on the project, testified that Dimassi and Epstein personally gave Skyline Electric employees instructions on how they should do their work.  He understood that he would install whatever Epstein told him to, wherever he told him to.  Epstein "gave [Karickhoff] to understand that they [Epstein and Dimassi] were involved in the ownership."

Ayoub Mehri, the HVAC contractor, testified that Dimassi told him what work to do and was at the project "pretty much every day."  Dimassi introduced Epstein to Mehri one time as "one of the owners, or something like that."

Mustafa Dabbakeh, who did carpentry work for the project, testified that Dimassi was "supposedly the owner of the place," that Goran was his partner, and that "everybody was interfering with how the work should be done."  Dimassi and Epstein both gave him instructions and ideas about the work for the project. From his discussions with Dimassi and Epstein, it appeared that they had a joint interest in getting the restaurant completed and opened.  According to Dabbakeh, Epstein told him that he was the holder of the lease and "it was in his interest that the place will be finished so he can collect his money on the lease, because some rent wasn't getting paid there to him."

Clint Nunley from Binswanger Glass testified that Fares was the only person who gave him instructions at the work site.

14

**Moshe Epstein**

Moshe Epstein testified that he and his wife operated Zorro's and a catering business, which is also owned by Eilat. Dimassi had been the general manager of Zorro's since January or February 2008, and he earned a percentage of the gross sales of the restaurant each month. Zorro's opened in June 2008. At the time of trial, Epstein was a member of KUV. Epstein testified that KUV had signed a lease as lessee for the South Freeway property.

Epstein testified that he initially worked with a man named Javier who worked at Palomina's for Dimassi; Epstein and Hargrove eventually decided not to do business with Javier. They entered into a sublease with Dimassi instead. Epstein admitted to "observing" at the construction site on a weekly basis and also to letting his credit card be charged two times for supplies. But Epstein said he did not give Karickhoff any instructions about what to do until after the project was being converted to Zorro's. According to Epstein, Karickhoff told him at that time that he could not work with him because if he did so, he would not be able to work with Fares anymore. Epstein also denied giving Mehri instructions while at the site. Epstein said he agreed to having the electric bill put in his name because Fares approached him and said it had to be done immediately; Epstein was simply "allow[ing] the work to continue." According to Epstein, Dimassi paid his rent through Goran, which was as if Dimassi had paid the rent himself. Dimassi started defaulting on rent in November 2007.

Epstein later admitted that there were times when he told the subcontractors that "I would have done something like that, but not more than that." It was important to him to get the business up and running so that he could make his profit. According to Epstein, in the beginning of the project he introduced Dimassi to Goran and they came to some kind of business arrangement, with "the money . . . between them." He did not know what was in the agreement and it was not his problem.

Epstein testified that if he and Fares were at the site together, they "talked about many things, the same as talked [sic] with other people." He understood that Goran was funding Dimassi for the construction, but he did not know how much. Epstein did not know Fares was going to abandon the project; when Epstein came back from a trip to Israel in mid November 2007, there was no one at the site. At that point, Epstein decided to take over the project to try to earn back what he and Hargrove had already invested. Epstein discovered Dimassi was already in personal and corporate bankruptcy but KUV mistakenly locked Dimassi out for abandoning the project.

Eventually, Epstein and his wife decided that Dimassi would be perfect to run the restaurant they had envisioned to recoup their losses. KUV eventually purchased Dimassi's sublease from the bankruptcy trustee for $11,000. The assignment of the sublease was subject to "any existing liens claims and encumbrances, to the extent they exist as to the Sublease."

16

Epstein admitted attending a meeting in December 2007 at which Fares was present. Fares said at that meeting that it would take approximately $50,000 to finish the restaurant. He said that Hargrove considered having Fares finish the work, but Epstein did not worry about it because he did not personally owe Fares any money.

The sublease to Eilat started June 2008; until then KUV financed all the work on finishing the improvements to the premises.

Appellant recalled Epstein to testify. Epstein said he met Mondragon in the beginning of 2007. Javier worked at Palomina's in Arlington, and Epstein met him there. Javier said he wanted to get out of Palomina's and open a restaurant with Epstein and Hargrove as investors. The two decided not to do business with Mondragon because "things would change like a moving target," but they did decide to find a restaurant for him. Epstein was looking for a place for Mondragon to open a restaurant when he saw the South Freeway building. He talked with the owner, who offered to either rent or sell the restaurant; after negotiating with Hargrove and Epstein, the owner agreed to lease terms. After the lease was signed, Mondragon backed out of signing a sublease. At that point, Epstein approached Dimassi, the owner of Palomina's in Arlington.

Epstein and Dimassi talked for a few days and came to an agreement on the same sublease terms Epstein and Hargrove had offered to Mondragon. Epstein denied having any discussions about entering into a joint venture or partnership with Dimassi. He also denied authorizing Dimassi to take any

17

actions on behalf of KUV. According to Epstein, Dimassi paid a security deposit for the sublease.

Epstein explained that he introduced Dimassi to Goran when Dimassi approached him saying he needed money; Epstein and Goran did not enter into a business relationship with respect to the building.[4] According to Epstein, Goran was never a representative of KUV, nor was he authorized to take any action on KUV's behalf.

Epstein admitted being at the construction site frequently. He claimed that he was keeping an eye on Ngai's equipment that was starting to disappear, that he would stop by after visiting other properties of his and Hargrove's in the area, and that he would ask the subcontractors working at the leased premises to work on his wife's rental space in Arlington where she operated her catering business. Epstein admitted saying from time to time that if the restaurant were his, he would do the work in a certain way, but because it was not, he would not dictate what to do. Epstein admitted talking to two subcontractors on the site, including the electrician.

KUV did not know about the Palomina's corporate bankruptcies because it was not a creditor of Palomina's, only Dimassi's. Epstein was not aware of Dimassi's personal bankruptcy filing until mid November 2007 when he returned from Israel. KUV attempted to terminate the sublease but could not because of

---

[4]They later became partners in an organic farming business.

18

the pending bankruptcy proceeding; however, Epstein and Hargrove did start to look for a replacement sublessee.

After Hargrove paid the December rent payment, he told Epstein he could not do it anymore and discussed abandoning the lease. Epstein then proposed that his wife open and operate a restaurant in the building. They agreed to finish out the restaurant and asked Dimassi to supervise the finish out and opening of the restaurant. Dimassi was paid out of the profits of the restaurant by Eilat, not KUV. According to Epstein, Dimassi had no authority to contract for KUV or Eilat, was not an authorized signatory on any of Eilat's or KUV's bank accounts, and did not participate in any of the bookkeeping or accounting.

Epstein testified that after KUV purchased Dimassi's sublease from the bankruptcy trustee, it immediately terminated it. However, KUV provided no evidence of any written termination of the sublease.

The only members of KUV are Epstein and Hargrove. According to Epstein, KUV did not ask Fares to do any work at the property, nor did Eilat do so. Epstein answered "No" when asked if there was any common ownership between KUV and DFW AUCE or between Eilat and DFW AUCE. He also testified that Dimassi had no interest in KUV or Eilat and that Dimassi had no common employees with KUV or Eilat, except when Dimassi was helping to get Zorro's ready to open; however, the workers during that time were temporary employees of KUV. KUV had no centralized accounting with Dimassi, nor did Dimassi pay any wages of employees of KUV or Eilat. There was no common

19

business name, no agreement to share profits or losses, no intent by anyone from KUV or Eilat to be Dimassi's partner, no right to participate in Dimassi's proposed restaurant, and no agreement by KUV, Hargrove, or Epstein to repay any of Dimassi's debts.

On cross-examination, Epstein admitted that the security deposit for KUV's lease was $20,000 and that Dimassi paid $15,000 to KUV that they used to pay part of the security deposit to Ngai. The $15,000 was Dimassi's security deposit for the sublease. They received the $15,000 from Dimassi on the day he signed the sublease; they received around $40,000 from Goran on Dimassi's behalf after that. The money was solely for rents and deposits under the sublease.

Dimassi was already in bankruptcy when Epstein agreed to put the electricity in his name; he said he did so because Fares told him the work could not be completed if Epstein did not do so. He admitted to meeting with Fares in a Bennigan's in Arlington but said he listened to Fares's problems with Dimassi and only "helped or heard."

### David Goran

Goran identified himself at trial as self-employed in real estate investment; he is the 100% shareholder and sole officer of DFW AUCE. Epstein approached Goran about investing in Dimassi's restaurant, and Goran decided to loan Dimassi money for tenant improvements. Goran agreed to loan Dimassi up to $150,000 in installments as work was finished. Goran disbursed funds by paying

20

Fares directly. According to Goran, Epstein was not involved in loaning any money.

Goran denied telling anyone that he owned two percent of the restaurant. But he did say that when Dimassi began to have trouble paying the bills, he and Dimassi had worked out that Goran would be entitled to a percentage of either net sales or profits until Dimassi could pay him back. They had these discussions in a meeting with Alahmady, Dimassi, and Fares. Goran denied being involved in "any type of business transaction or relationship" with Epstein or Hargrove. On July 30, 2007, Goran wired money to Hargrove's account, but Goran does not remember what it was for or what Hargrove did with it.

Goran estimated that he went to the construction site about three to four times a month for three or four months. He saw Epstein there. He admitted signing a note to Dimassi but he could not explain the details. On cross-examination, Goran said that he knew Fares continued to work on the project after learning of Dimassi's bankruptcy. He denied ever being a partner of Dimassi's or having any commonality with KUV or Eilat.

### Mac Hargrove

According to Hargrove, Dimassi defaulted in his rent in either September or October 2007. Two payments for Dimassi's obligations under the sublease came from Goran's account. One of the payments was for KUV's obligation as

lessee for tax and insurance payments and for a portion of Dimassi's deposit.[5]

Hargrove testified that he set up an account at Sterling Bank for the sublease funds so that all payments KUV received from either Dimassi or Goran were applied solely to rent, expenses, and deposits under the sublease.

Hargrove testified that he was at a meeting with Epstein and Laurie Deltuva in December 2007 at the Palomina's in Arlington when Fares happened to show up. Epstein and Hargrove began talking with Fares, and Hargrove asked how much it would cost to finish the work; Fares responded, "$50,000," and the two asked Fares to complete the work for that price. Hargrove denied paying any personal money toward the finish out of the space.

Hargrove testified that when the bankruptcy court entered the order approving of the assignment of the sublease to KUV, Hargrove knew that Fares claimed a lien on "some interest in the property."

When Hargrove learned that Dimassi was on the premises between February and May 2008 for the purpose of opening Zorro's, he was concerned:

> Two concerns. Number one is that I was very concerned about getting the rent paid; and number two, was the fact that the restaurant seemed to be very delayed in the opening, and I did not want this to go on indefinitely, and I was reassured that Mr. Dimassi was an employee, that there was no connection between operation, which Mr. Epstein had put together, and that he was -- totally be -- he would be totally paid as an employee, and that there would be no involvement with Mr. Dimassi in the new restaurant.

_____

[5]According to Hargrove, based on his extensive experience in Texas real estate, there is no statute or regulation requiring KUV to keep the security deposit money received from Dimassi in a separate bank account.

Epstein resolved Hargrove's fears by assuring Hargrove that Dimassi was only an employee and there was "no involvement" with Dimassi in the new restaurant. Hargrove characterized himself as merely an investor, with Epstein in charge of how the businesses were operated.

At one point, Hargrove considered trying to get KUV out of the lease with Ngai, so he "insisted to [Epstein] that something be done." Epstein, however, suggested they try to work it out, which is how they got involved in starting Zorro's in the space. Hargrove answered basically the same questions as Epstein: that Dimassi was never a member of KUV and that they had never entered into a joint venture with Dimassi, never agreed to repay his debts, never agreed to give him any interest in KUV, and never agreed to participate in Dimassi's restaurant.

Upon returning from Israel and learning that Dimassi was in bankruptcy, Hargrove attempted to terminate Dimassi's sublease and show the space to other prospective tenants. He discussed the possibility with KNW Group, but they "were not willing to make the necessary investment." He explained the difference in the rent Eilat was paying versus the original rent: he had already lost so much money on the Dimassi sublease that he was trying to make it up, and his information showed a restaurant in that space could be very profitable. Upon buying Dimassi's sublease from the trustee, KUV terminated it immediately and "began to work desperately on finding someone else."

23

KUV remained current on all but one of its payments to Ngai even though Dimassi was in default under the sublease.

**Ricki Epstein**

Ricki Epstein is Epstein's wife and the president and one of the shareholders of Eilat. She participates in the daily management of the restaurant but confirmed that Dimassi is the general manager. Ricki said she met Dimassi when her husband told her, "Mac is going to lose a lot of money, we need to see how to help out and maybe take over the restaurant." When Ricki told Epstein she did not have the experience to run a restaurant, he suggested Dimassi. According to Ricki, she and Epstein were very concerned about Hargrove losing money and wanted to help him any way they could.

**Kaiss Alahmady**

Kaiss Alahmady testified that in October 2007, he approached Fares about trying to buy the Palomina's restaurants out of bankruptcy. He and Fares formed KNW Group. Alahmady denied being approached by anyone on behalf of KUV to offer a sublease on the property. KNW Group bought the Palomina's restaurants in Arlington and Richardson and took ownership of them in January 2008.

On cross-examination, Alahmady testified that he first heard about the South Freeway restaurant in October 2007 when he was investigating purchasing the other Palomina's restaurants. He visited the site and met Dimassi and Fares. The few times he was there, he found out about Dimassi's

money troubles; he heard Dimassi "several times promising payment, promising that the Fort Worth group will eventually pay Fares Construction." Alahmady said he knew Dimassi, Epstein, Hargrove, and Goran and "[i]t appeared to [him] that they are working as a partner or a working a joint venture with each party interested in a specific area of the operation with one objective as to operate the restaurant in Fort Worth." According to Alahmady,

> Mr. Dimassi always brought the subject [up] when he discussed Mr. Epstein and Mr. Goran and Mr. Mac Hargrove, he was talking about them like partner. He was talking about the venture and trying to -- to put it as a joint venture, where he's going to operate, he's going to be the vehicle for operation of that location as a restaurant, that eventually Mr. Hargrove will cash in through some mortgage arrangement, that Mr. Goran has invested some money in, and he's looking for two percent partnership equivalent from the revenue.

For those reasons, Alahmady thought it was clear that they were all "operating together for one objective of finishing the restaurant."

### Nabil Dimassi

Dimassi testified that at the time of trial he was an employee of Texas Zorro's, employed by Eilat. He was the general manager of the restaurant, and his compensation was roughly four percent of net sales. He had owned four companies, Dallas Buffet, Inc., Richardson Buffet Dining, Inc., Sherman Buffet Dining, Inc., and Valencia, but he filed bankruptcy proceedings for all of them in June 2007, less than one month after signing the sublease with KUV. He did not inform Hargrove or Epstein of the filing. Dimassi had not provided any financial information to Hargrove or Epstein for the sublease; Mondragon did so when he was discussing opening up his own restaurant.

According to Dimassi, Fares never gave him an initial estimate of how much the work would cost. In addition, Dimassi testified that he instructed Fares to stop the work several times but that Fares continued working for thirty to forty days despite the instruction.

Dimassi's agreement with Goran was that in exchange for the money he was advancing for the project, Goran would receive two percent of the net sales from the restaurant until his investment was paid back. During a one-day period in the fall of 2007 when Dimassi's bankruptcy was mistakenly dismissed, he had Goran sign a $200,000 note to him as "part of a management agreement." According to Dimassi, if Goran "got to use somebody else or fire me, he's going to have to pay me $200,000 as a penalty." In other words, "it was an umbrella protection for [him], and also for Mr. Fares."

Dimassi paid the $15,000 security deposit from the other Palomina's companies. Dimassi was at the job site three to five times per week. He estimated that Fares had been paid a little over $100,000 for the work done.

On cross-examination, Dimassi said that Mondragon had stolen the financials for Palomina's to give to Epstein and Hargrove and that Dimassi had subsequently sued Mondragon. Dimassi met Epstein when Epstein came into the restaurant asking whether Dimassi could sell some wholesale food to Epstein's wife for her catering business. At that time, they discussed Dimassi's possibly entering into the sublease. Dimassi said he told Epstein of his financial difficulties at that time, but Dimassi also said that he told Epstein he might be

able to open the restaurant through an investor. Epstein later introduced Dimassi to Goran. They made an oral agreement for Goran to loan him $150,000 to be repaid over a two-year period from the restaurant's net sales. He did not offer Goran any interest in the restaurant. He denied discussing a partnership with Epstein, offering Epstein or Hargrove any interest in the restaurant, or having any interest in KUV or Eilat.

Dimassi was aware that Fares and Alahmady were interested in buying the Palomina's restaurants; he talked to them about it every day. In fact, the "N" in KNW Group stood for Nabil; he was to participate in the group, but he withdrew on the advice of his bankruptcy attorney. Consequently, when Dimassi ordered Fares to stop work, Fares told him that KNW Group was going to get the restaurant anyway, so he had to finish the work. Dimassi's conversations with Alahmady and Fares took place between October 2007 and January 2008. Hargrove offered the opportunity for KNW Group to take the sublease to Dimassi, who presented it to Fares and Alahmady, but Alahmady rejected the idea. According to Dimassi, Fares and Alahmady also approached Ngai to try to foreclose on the KUV lease.

Dimassi testified that he told Fares he had a sublease with KUV, but he never told him he was in a partnership or joint venture with KUV. According to Dimassi, Epstein did not direct work at the site, but he came "wandering around the property . . . giving [his] opinion to subcontractors or contractors and talk[ing] to Mr. Fares or [Dimassi], and basically . . . stick[ing] his nose in things." Dimassi

27

said that Epstein offered suggestions to Dimassi all the time, but he never countermanded any of Dimassi's instructions. He characterized the suggestions as opinions, not instructions, and said Fares should not have followed them.

Dimassi denied having an ownership interest in KUV or Eilat, or having been a partner, joint venturer, or representative of either. Dimassi never paid the wages of KUV or Eilat employees; they had no common centralized accounting, no common business name, no employees render services on behalf of the other, no undocumented transfers of funds other than rent money, and no allocation of profits and losses with each other. KUV and Eilat had no right to participate in the restaurant and never contributed any capital to it.

**Whether Evidence Supports Joint Enterprise and Joint Venture**

In the first issue, KUV contends that there is no evidence to support a finding that it is vicariously liable for Dimassi's obligations to Fares under a joint enterprise or joint venture theory.[6]

The essential elements of joint enterprise or joint venture are (1) an express or implied agreement among the members of the group, (2) a common purpose to be carried out by the group, (3) a community of pecuniary interest in that purpose, and (4) an equal voice in the direction of the enterprise, which

---

[6]Fares does not argue that there is evidence supporting the trial court's judgment on grounds of partnership, alter ego, or single business enterprise, nor have we found any such evidence in our review of the record. *See* Tex. Bus. Orgs. Code Ann. § 152.052 (Vernon Supp. 2010); *Ingram v. Deere*, 288 S.W.3d 886, 894–904 (Tex. 2009); *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454, 456 (Tex. 2009).

gives an equal right of control. *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2009); *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 850 (Tex. App.—Fort Worth 2006, no pet.) (op. on reh'g). A common pecuniary interest is a monetary interest among the members of the group and shared without special or distinguishing characteristics. *Bell v. VSPI, Inc.*, 205 S.W.3d 706, 722 (Tex. App.—Fort Worth 2006, no pet.); *see St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 528 (Tex. 2003). However, the benefit must be more than just a financial one "from the successful downstream marketing of the[] goods or services." *Wolff*, 94 S.W.3d at 528. For instance, a franchisor may have a common pecuniary interest in the retail sales of its franchisees, but it does not have a "community of pecuniary interest" because its financial benefit is indirect whereas the franchisee's is direct. *Id*.

Here, there is no evidence of a community of pecuniary interest among KUV, Goran, DFW AUCE, and Dimassi.[7] KUV was the sublessor, obligated under the lease with Ngai whether Dimassi fulfilled his obligations under the sublease or not. There is no evidence that KUV had an interest in any of the proposed Palomina's profits; it was only entitled to the lease payments from Dimassi as the sublessee. As appellant's counsel pointed out in his closing argument, Epstein's involvement in the buildout of the premises is not so

---

[7]Fares contends that KUV failed to challenge this implied finding, but in its brief, KUV states that it is challenging *any* findings pertaining to joint venture. Accordingly, we hold that the complaint is preserved. *See* Tex. R. Civ. P. 299; Tex. R. App. P. 38.1(f).

surprising; landlords frequently have a representative on site during the construction of improvements.  Moreover, Epstein and Hargrove knew KUV would not receive its rent under the sublease unless and until the restaurant opened.  Thus, evidence of Epstein's direct involvement with the construction of the improvements does not show such a direct benefit as would constitute a community of pecuniary interest among KUV, Dimassi, and DFW AUCE.  Accordingly, there is no evidence supporting the trial court's implied finding of such an interest and its conclusion that the parties were involved in a joint venture.  We sustain the first issue.

**Agency**

KUV additionally contends that there is no evidence supporting the judgment on the theory that it breached a contract with Fares because there is no evidence to support a finding that Dimassi was acting as an agent for KUV.

The law does not presume agency.  *Tex. Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, pet. dism'd [mand. dism'd]); *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 22 (Tex. App.—San Antonio 2006, pets. denied).  The party alleging agency has the burden to prove its existence.  *Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 352; *Lifshutz*, 199 S.W.3d at 22.  Absent actual or apparent authority, an agent cannot bind a principal.  *Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 352; *Lifshutz*, 199 S.W.3d at 22.

Actual authority includes both express and implied authority and usually denotes the authority a principal (1) intentionally confers upon an agent, (2)

30

intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses. *Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 352; *2616 S. Loop L.L.C. v. Health Source Home Care, Inc.*, 201 S.W.3d 349, 356 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *Lifshutz*, 199 S.W.3d at 22. Actual authority is created through conduct of the principal communicated to the agent. *Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 352; *Lifshutz*, 199 S.W.3d at 22.

Apparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 672 (Tex. 1998); *Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 353. Certain limitations apply in determining whether apparent authority exists. *Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 353; *Lifshutz*, 199 S.W.3d at 22. First, apparent authority is determined by looking to the acts of the principal and ascertaining whether those acts would lead a reasonably prudent person using diligence and discretion to suppose the agent had the authority to act on behalf of the principal. *Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 353; *Lifshutz*, 199 S.W.3d at 22. Only the conduct of the principal may be considered; representations made by the agent of his authority have no effect. *Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 353; *Lifshutz*, 199 S.W.3d at 22–23. Second, the principal must either have affirmatively held the agent out as possessing the authority, or the principal must have knowingly and voluntarily permitted the agent to act in an unauthorized

31

manner. *Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 353; *Lifshutz*, 199 S.W.3d at 23. Finally, a party dealing with an agent must ascertain both the fact and the scope of the agent's authority, and if the party deals with the agent without having made such a determination, she does so at her own risk. *Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 353; *Lifshutz*, 199 S.W.3d at 23.

Here, there is no evidence of any assertions by Epstein or Hargrove that Dimassi was KUV's agent; in fact, Fares himself testified that he knew Epstein was Dimassi's landlord, but he just did not know the extent of Epstein's involvement in the project. However, Fares also admitted that he initially contracted with Dimassi, and Dimassi approved all the work before Fares started it. This evidence is not inconsistent with a sublessor/sublessee relationship between KUV and Dimassi. Moreover, to the extent that any of Fares's or the subcontractors' testimony can be interpreted as representations by *Dimassi* that KUV was something more than a landlord, those representations are not sufficient to prove an agency relationship. *See Tex. Cityview Care Ctr., L.P.*, 227 S.W.3d at 353; *Lifshutz*, 199 S.W.3d at 22–23. Accordingly, we conclude and hold that there is no evidence to support a finding or conclusion that Dimassi was acting as KUV's agent in entering into the contract with Fares and, thus, no evidence that KUV is vicariously liable for breach of that contract. We sustain the second issue.

**Quantum Meruit**

In the fourth issue, KUV contends that there is no evidence supporting a damage award against it on a quantum meruit theory.

To recover in quantum meruit, a party must prove that (1) he or she rendered valuable services or furnished materials, (2) for the person sought to be charged, (3) the services or materials were accepted, used, and enjoyed by the person sought to be charged, and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services or furnishing such materials was expecting to be paid by the person sought to be charged. *Vortt Exploration Co. v. Chevron USA, Inc.*, 787 S.W.2d 942, 944 (Tex. 1990); *Residential Dynamics, LLC v. Loveless*, 186 S.W.3d 192, 199 (Tex. App.—Fort Worth 2006, no pet.). In addition, the evidence must show that the efforts were undertaken for the person to be charged and not just that the efforts benefitted that person. *McFarland v. Sanders*, 932 S.W.2d 640, 643 (Tex. App.—Tyler 1996, no pet.).

The party seeking to recover in quantum meruit must establish that the work done was accepted by the party to be charged "under such circumstances as reasonably notified the recipient that *the plaintiff*, in performing expected to be paid by the recipient." *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 917 (Tex. App.—Dallas 2008, no pet.) (emphasis added); *see Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). The evidence must show that this reasonable notification occurred at the time the services were accepted.

33

*Heldenfels Bros.*, 832 S.W.2d at 41; *Myrex Indus., Inc. v. Ortolon*, 126 S.W.3d 548, 551 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Thus, here, the notice element should focus on what KUV, not Fares, knew or should have known at the time that it accepted the services if it indeed did. *See Heldenfels Bros.*, 832 S.W.2d at 41;*Tricon Tool & Supply, Inc. v. Thurmann*, 226 S.W.3d 494, 504 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

Here, Fares was assured by Goran and Dimassi of payment, and Goran even said he would sell cans to pay Fares back. Although Epstein spoke of helping out Dimassi because he was "choking," there is no evidence that Epstein ever offered to pay *Fares* directly for anything; the few times he paid for something, he paid directly to the supplier and only for specific items. *Cf. Wohlfahrt v. Holloway*, 172 S.W.3d 630, 636–37 (Tex. App.—Houston [14th Dist.] 2005, pets. denied), *cert. denied*, 549 U.S. 1052 (2006). This situation is similar to those in *Heldenfels* and *Sanders*. In *Heldenfels*, a subcontractor sought payment from the property owner, the City of Corpus Christi, but the Supreme Court concluded that the subcontractor had no reasonable expectation of payment from the City even though the City had approved payment to the general contractor for items supplied by the subcontractor. 832 S.W.2d at 40–41. In *Sanders*, the Dallas Court of Appeals held that an HVAC subcontractor had no reasonable expectation of payment from a homeowner even though the homeowner had attended meetings "about upgrades, prices, and extra work" and personally approved the invoiced work. 248 S.W.3d at 917.

34

Here, the evidence shows that when Fares was working on the project, everyone expected either Dimassi or Goran, individually or through DFW AUCE, to pay for the improvements Fares constructed. All of the invoices admitted into evidence are addressed to either Texas Palomina's, Dimassi, or DFW AUCE.[8] There is no evidence of any payment from KUV, Epstein, or Hargrove to Fares for any purpose. Thus, there is no evidence to support a finding or conclusion that KUV had reasonable notification at the time the improvements were being constructed that Fares expected payment from it and not Dimassi, Goran, or DFW AUCE.

This case is distinguishable from *Angroson v. Indep. Commc'ns, Inc.*, 711 S.W.2d 268 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). In that case, a tenant contracted directly with a contractor to make improvements to leased premises, and the work was started and completed for the tenant *before* the tenant entered into a sublease. *Id*. at 270. The tenant and sublessor paid $25,000 to the contractor but then refused to pay any more. *Id*. In addition, the tenant and sublessee corporations were owned by the same sole shareholder. *Id*. Accordingly, that case is inapposite.

We conclude and hold that there is no evidence to support a finding or conclusion that Fares reasonably notified KUV that he expected payment from it

---

[8]Fares contended at argument that because the invoices had the property address on them, he reasonably notified KUV of his expectation of payment from "the project." But none of the invoices were addressed specifically to Epstein, Hargrove, or KUV, and Fares admitted that he hand delivered the invoices to Dimassi at the work site, not to Epstein or Hargrove.

for the improvements to the leased premises. Accordingly, there is no evidence supporting an award of damages based on quantum meruit. We sustain the fourth issue.

**Foreclosure of Materialman's Lien**

In the third issue, appellants contend that the trial court erred by finding or concluding that Fares perfected a materialman's lien on KUV's leasehold interest and by awarding Fares foreclosure of that lien. In the fifth issue, appellants contend that the lien on Dimassi's subleasehold is no longer valid because they purchased the sublease and terminated it.

To have a valid materialman's lien, the owner of the land affected must be a party to the contract creating the lien. *2811 Assocs., Ltd. v. Metroplex Lighting & Elec.*, 765 S.W.2d 851, 853 (Tex. App.—Dallas 1989, writ denied); *Inman v. Orndorff*, 596 S.W.2d 236, 238 (Tex. Civ. App.—Houston [1st Dist.] 1980, no writ). A lien on real property cannot be established merely by virtue of a contract between a lessee of the property and the materialman. *2811 Assocs.*, 765 S.W.2d at 853. "If a lessee contracts for construction, the mechanic's lien attaches only to the leasehold interest, not to the fee interest of the lessor." *Id*. (quoting *Diversified Mortg. Investors v. Lloyd D. Blaylock Gen. Contractor, Inc.*, 576 S.W.2d 794, 805 (Tex.1978)); *see also Grube v. Nick's No. 2*, 278 S.W.2d 252, 253–54 (Tex. App.—El Paso 1955, writ ref'd n.r.e.). "A mechanic's lien may be foreclosed only on judgment of a court of competent jurisdiction foreclosing the lien and ordering the sale of the property subject to the lien." Tex. Prop.

Code Ann. § 53.154 (Vernon 2007); *CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 239 (Tex. 2002).

KUV does not challenge the trial court's conclusion that Fares's materialman's lien attached to *Dimassi's* subleasehold; Dimassi directly contracted with Fares to do the work that was completed. *See MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc*., 179 S.W.3d 51, 57 (Tex. App.—San Antonio 2005, pet. denied) (setting forth elements required to establish valid mechanic's and materialman's lien). Pursuant to the bankruptcy court's approval, the trustee assigned Dimassi's sublease to KUV, subject to all liens and encumbrances that had attached. Thus, upon that assignment, KUV stood in Dimassi's place as the sublessee. *See State v. Oakley*, 181 S.W.3d 855, 860 (Tex. App.—Austin 2005), *rev'd in part on other grounds*, 227 S.W.3d 58 (Tex. 2007). Accordingly, unless KUV's leasehold merged with the assigned subleasehold, the only estate to which Fares's lien could have attached is KUV's *subleasehold* interest, not its leasehold interest.

Merger of estates is the absorption of a lesser estate in land into the greater; however, application of this doctrine is disfavored in Texas. *Steger v. Muenster Drilling Co.,* 134 S.W.3d 359, 376 (Tex. App.—Fort Worth 2003, pet. denied). For merger to occur, the following elements must be present: (1) there must be a greater and lesser estate; (2) both estates must unite in the same owner; (3) both estates must be owned in the same right; (4) there must not be an intervening estate; (5) merger must not be contrary to the intention of the

37

owner of the two estates; and (6) merger must not be disadvantageous to the owner of the two estates. *Id*.

The issue of whether a merger of estates was intended is ordinarily a question of fact that is determined by considering the estate owner's interest and all attending circumstances. *Id*. Equity will not, however, decree a merger of estates when it would be disadvantageous to the person acquiring both interests. *Id*. Thus, if, "from all the circumstances, a merger would be disastrous to the party holding both estates, then his intention that it should not result will be presumed." *Id*. at 376–77. Further, when the evidence shows that it was in the interest of the owner of the estates that they remain separate, the law presumes an intent corresponding with such an interest. *Id*. at 377.

KUV contends that it attempted to terminate Dimassi's sublease after purchasing it. In addition, it subsequently re-subleased the premises to Eilat under similar terms as Dimassi's sublease. Moreover, there is no evidence that KUV acted as if it owned both a lease *and* a sublease on the premises or that Eilat was a second sublessee. Thus, the evidence shows an intent by KUV that the two estates be merged. *See Franz v. Katy ISD*, 35 S.W.3d 749, 754 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Because Fares had already perfected his lien against the Dimassi sublease when KUV bought it expressly subject to all liens and encumbrances, that lien became attached to KUV's leasehold interest when the lease and sublease merged. *See id*. at 754–55. Although the attachment of that lien does work somewhat of a disadvantage to KUV, KUV

38

nevertheless benefitted from the dissolution of the Dimassi sublease and the subsequent ability to re-sublease the premises to Eilat, thus ensuring a new revenue stream for payment of its rental under the lease with Ngai. *See id*. at 755.[9] Therefore, the trial court did not err by awarding foreclosure of the materialman's lien against KUV's leasehold interest.

But the trial court did err by ordering foreclosure on Eilat's subleasehold interest. Although Eilat's sublease is subordinate to KUV's leasehold, that sublease was executed after the perfection and attachment of the materialman's lien to KUV's leasehold interest, and the foreclosure of that lien will terminate Eilat's sublease so that there will not be any sublease interest to further foreclose upon. *See Aspenwood Apt. Corp. v. Coinmach, Inc*., No. 01-08-00636-CV, 2011 WL 478546, at *5 (Tex. App.—Houston [1st Dist.] Feb. 10, 2011, no pet.) (holding that foreclosure of greater estate terminates lease but subject to purchaser and lessee entering into new, independent lease agreement); *ICM*

---

[9]In its motion for rehearing, KUV contends that it could not have intended that the two estates merge because the disadvantage of having its leasehold encumbered by the mechanics' lien greatly outweighs the income stream from the sublease to Eilat. But the question is whether the merger of the lease and sublease would disadvantage KUV, not whether its leasehold being subject to the mechanics' lien would disadvantage it. Because KUV bought the sublease subject to the lien, even if the two estates did not merge, KUV's subleasehold interest would still be encumbered by the lien. KUV's ineffective attempt to extinguish the lien by terminating the sublease therefore does not show that KUV would be disadvantaged by application of the doctrine of merger or that it never intended for the two estates to merge.

*Mortg. Corp. v. Jacob*, 902 S.W.2d 527, 530 (Tex. App.—El Paso 1994, writ denied).[10]

We overrule the fifth issue as to KUV and Eilat and the third issue as to KUV. But we sustain the third issue as to Eilat.

**Propriety of Damage Award Against Eilat**

In the sixth issue, Eilat challenges the trial court's damage award against it as improper because (a) Fares never pled a claim for damages against Eilat, (b) there is no evidence Eilat has any liability to Fares, and (c) there are no express or implied findings supporting a damage award against it.

Fares did not include a claim for damages against Eilat in his pleadings. In fact, during closing argument, his counsel told the trial court that Fares was not claiming that Eilat had any personal liability to Fares but that Eilat was merely the party with the right to possession of the premises for purposes of foreclosing the lien. Nothing in the record indicates that any claim for damages against Eilat was tried by consent. *See Herrington v. Sandcastle Condo. Ass'n*, 222 S.W.3d 99, 102–03 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Moreover, there are no

---

[10]Both the lease to KUV and the sublease to Eilat provide that all alterations, improvements, and fixtures to the leased premises remain with the premises upon termination of the lease or sublease unless required to be removed by the owner of the premises. Thus, the purchaser of KUV's leasehold at any foreclosure sale will obtain KUV's entire interest in the leasehold but will not be able to remove any alterations, fixtures, or improvements—whether installed by Fares or any subsequent contractor—without KNW Group's consent. Neither will Eilat be able to remove anything other than movable personal property that is not affixed to the premises. Moreover, even if there were a need to distinguish between work performed by Fares and any subsequent contractor, Fares introduced invoices detailing the type of work performed at the premises.

40

findings or conclusions that support a damage award against Eilat. Accordingly, there is no basis on which to uphold the inclusion of Eilat in the list of parties jointly and severally liable to Fares for damages. *See* Tex. R. Civ. P. 301; *Bayou Terrace Inv. Corp. v. Lyles*, 881 S.W.2d 810, 817 (Tex. App.—Houston [1st Dist.] 1994, no writ) (op. on reh'g); *Dalon v. City of DeSoto*, 852 S.W.2d 530, 537 (Tex. App.—Dallas 1992, writ denied). We sustain the sixth issue.

## Conclusion

Having sustained KUV's first, second, and fourth issues challenging the theories of vicarious liability pled and urged by Fares at trial, we reverse that part of the trial court's judgment ordering KUV to pay damages to Fares.[11] In addition, having sustained Eilat's sixth issue challenging the award of damages to Fares, we reverse that part of the trial court's judgment ordering Eilat to pay damages to Fares.[12] Having sustained the third issue as to Eilat, we also modify the judgment to delete the part ordering foreclosure of Eilat's sublease interest in the leased premises. *See* Tex. R. App. P. 43.2(b).

We affirm the part of the judgment ordering foreclosure of Fares's materialman's lien against KUV's leasehold interest. However, because of our disposition of the first, second, fourth, and sixth issues, we must also remand the

---

[11]Because the seventh issue pertains only to the amount Fares claimed he was vicariously owed from KUV, we need not address it. *See* Tex. R. App. P. 47.1; *Horsley-Layman v. Adventist Health Sys./Sunbelt, Inc.*, 221 S.W.3d 802, 809 (Tex. App.—Fort Worth 2007, pet. denied).

[12]Because DFW AUCE did not appeal, we do not disturb the trial court's damage award as to DFW AUCE.

41

case to the trial court for a new determination of attorney's fees. *See* Tex. Prop. Code Ann. § 53.156 (Vernon 2007); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006).

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

DELIVERED:  March 17, 2011