# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-12-00177-CV

**Danette Marilou Pappas, Appellant**

**v.**

**William Michael Pappas, Appellee**

FROM THE DISTRICT COURT OF BELL COUNTY, 169TH JUDICIAL DISTRICT
NO. 236,404-C, HONORABLE GORDON G. ADAMS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Danette Marilou Pappas and William Michael Pappas filed a petition and counter-petition for divorce. Following a bench trial, the trial court granted the divorce and divided the couple's property and debts. In five issues on appeal, Danette[1] challenges the trial court's division of property. We will reverse the judgment and remand the cause to the trial court for a new division of the marital estate.

## BACKGROUND

Danette and Michael were married on July 24, 1992. No children were born during the marriage. On May 27, 2009, Danette filed for divorce. Shortly thereafter, Michael filed a counter-petition for divorce. Both parties requested an equal division of the community estate. After

---

[1] For clarity, we will identify appellant by her first name and appellee by his middle name, by which he identifies himself.

a bench trial, the trial court granted the parties' petitions for divorce, awarded Danette real and personal property valued at $596,665.95, and awarded Michael real and personal property valued at $603,829.66. On appeal, Danette asserts that the trial court made several errors in valuing the property in the marital estate, which she says resulted in a division of the estate that is so disproportionate as to be manifestly unjust. She contends the trial court abused its discretion by (1) declining to recognize a community-property claim for economic contribution related to a rental-storage business known as "Northwest Hills," which Michael owned and operated in a partnership with his father, (2) disregarding expert testimony concerning the value of the community interest in Northwest Hills, (3) failing to dispose of a community interest in the real property on which Michael co-owned and operated a business known as "Best Way Carpet," (4) failing to dispose of community funds Michael earned after divorce proceedings were initiated, and (5) finding that she wasted community assets.

## STANDARD OF REVIEW

A trial court has broad discretion in dividing the marital estate, and we presume the trial court exercised its discretion properly. *Murff v. Murff*, 615 S.W.2d 696, 698-99 (Tex. 1981). In dividing the community estate, the trial court must order a division of the property that it deems just and right, having due regard for the rights of each party. Tex. Fam. Code Ann. § 7.001 (West 2006). The division of the community estate need not be equal, but it should be equitable. *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.). Trial courts have broad discretion and are permitted to consider a variety of factors in making a just and right division of property. *Murff*, 615 S.W.2d at 698-99; *see also Schlueter v. Schlueter*, 975 S.W.2d 584, 589

2

(Tex. 1998). An appellate court will correct the trial court's division of marital property only when a clear abuse of discretion has been established. *Murff*, 615 S.W.2d at 698; *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974). A clear abuse of discretion is shown if the division of property is manifestly unjust. *See Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980). "The party attacking the property division bears the heavy burden of showing that the trial court's property division was not just and right." *Pletcher v. Goetz*, 9 S.W.3d 442, 445 (Tex. App.—Fort Worth 1999, pet. denied).

Under an abuse-of-discretion standard in a family-law case, legal and factual insufficiency are not independent grounds for reversal but are instead relevant factors in assessing whether the trial court abused its discretion. *Doyle v. Doyle*, 955 S.W.2d 478, 479 (Tex. App.—Austin 1997, no pet.). To determine whether the trial court abused its discretion due to legally or factually insufficient evidence to support its decision, we engage in a two-pronged inquiry, considering (1) whether the trial court had sufficient evidence on which to exercise its discretion, and (2) whether it erred in its application of that discretion. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Under the first prong, we apply the traditional evidence-sufficiency standards and then proceed to determine whether, under the second prong, the trial court's decision was arbitrary or unreasonable. *Id*. Errors in valuation require reversal only when the errors make the property division so disproportionate as to constitute an abuse of discretion. *See Grossnickle v. Grossnickle*, 935 S.W.2d 830, 851 (Tex. App.—Texarkana 1996, writ denied). If there is reversible error that materially affects the trial court's "just and right" division of property, we must remand the entire community estate for a new division of property. *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985).

In this case, the trial court acted as the fact-finder and is, therefore, the sole judge of the witnesses' credibility. *See Murff*, 615 S.W.2d at 700. As such, the court was free to consider all the facts and circumstances in connection with the testimony of each witness and accept or reject all or part of that testimony, and we may not substitute our judgment for the trial court's assessment of the witnesses' testimony. *See In re W.E.R.*, 669 S.W.2d 716, 716-17 (Tex. 1984).

**DISCUSSION**

Danette requested an equal division of the marital estate, and the trial court awarded her 49.7% of the estate, as valued by the court. On appeal, Danette contends that the trial court dramatically undervalued the estate due to several errors and omissions. Broadly stated, the issues on appeal pertain to valuation of claims related to real property used by the Northwest Hills storage business (appellate issues one and two), disposition of real property on which Best Way Carpet operated its business (appellate issue three), and disposition of the funds in each party's possession after divorce proceedings were initiated (appellate issues three and four). She contends the cumulative effect of the trial court's errors resulted in a division of the marital estate that was not just and right (appellate issue five). We will address these issues in turn.

*Northwest Hills Storage Business*

Northwest Hills is a rental-storage business that operates on several lots in three different blocks of the Milestone Planned Development—Blocks 1, 7, and 8—which were acquired and improved at different times over an extended period of years, both before and during the marriage. In the proceedings below, the parties did not dispute that Michael's interest in the

4

Northwest Hills partnership began before he married Danette and was formalized in a written partnership agreement executed shortly before the marriage, but they did dispute the extent of Michael's ownership interest in the business.[2] They also disputed whether some of the real property used in the business should be characterized as partnership property, separate property, or community property. Chronologically, Michael obtained an interest in the lots in the following order, Block 8, Block 1, and Block 7. With respect to Block 8, Danette does not dispute the trial court's finding that it is Michael's separate property, but she asserts that the court erred in denying her economic-contribution claim on behalf of the community with regard to improvements made to that property after the marriage. With respect to Blocks 1 and 7, she contends the trial court significantly undervalued the community's interest.

**Block 8**:

In her first issue, Danette asserts that the trial court erred in denying her economic-contribution claim regarding post-marriage improvements to Block 8. The lots in Block 8 were purchased in 1989 by Michael and his father. Block 8 has six buildings—A, B, C, D, E, and F—that were built with funds Michael and his father borrowed from a third-party lender prior to Michael and Danette's marriage. Construction on one of the buildings was completed before they

---

[2] At trial, several witnesses testified that the business started as a general partnership, which was rolled into a limited liability corporation in 1994. The limited liability corporation was later dissolved, but the general partnership remained intact. Although the partnership agreement specified that the partners had equal ownership interests, Michael and his father testified that Michael held only a 49% interest. Danette relied extensively on the original partnership agreement executed in May 1992 as governing the terms of the partnership and, in particular, the extent of Michael's ownership interest in the business.

married, but the remaining units were completed after marriage. The foregoing facts are undisputed. There is also some evidence that Michael and his father either took out additional construction loans or extended the existing loans after the marriage, but it is undisputed that all of the construction loans were discharged by the partnership after the marriage with rental proceeds that were retained by the partnership.

In the proceedings below, Michael testified that he contributed his share of Block 8 to the Northwest Hills partnership, in which he claims a separate-property ownership interest based on its formation prior to the marriage. Danette asserted that Block 8 is not partnership property but rather is Michael's separate property because it was purchased in his name rather than the partnership's name. The trial court found, and Danette acknowledges, that the lots in Block 8 are Michael's separate property. Danette contends, however, that the community estate has a mandatory economic-contribution claim in the amount of $330,547 because the construction loans were discharged during the marriage. Danette maintains that the construction loans were personal loans rather than loans to the partnership because they were taken in the names of Michael and his father. Consequently, she asserts, any payments on the loans by the partnership were effectively distributions of partnership profits, which would be community income. *See, e.g.*, *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 27 (Tex. App.—San Antonio 2006, pet. denied) ("[S]ince partnership property does not retain a separate character, distributions from the partnership are considered community property, regardless of whether the distribution is of income or of an asset.").

The trial court neither required Michael's separate estate to repay a claim for economic contribution nor expressly included an economic-contribution claim in the marital estate.

6

Instead, the court found that "[Danette's] claims for reimbursement and economic contribution are not supported by credible evidence; in any event, those claims are resolved as a part of the Court's just and right division of the community estate." On appeal, Danette contends that the evidence establishes all of the essential elements of the statutory economic-contribution formula and that the trial court was required to recognize the economic-contribution claim as a community asset subject to just and right division. In Michael's view, the trial court properly declined to recognize an economic-contribution claim on behalf of the community estate because (1) Danette's expert admitted that he did not have all the information needed to properly calculate an economic-contribution claim under the applicable law; (2) there is sufficient evidence that the debt was extinguished by partnership property—income from rental units retained for the present or reasonably anticipated needs of the business—rather than community property; and (3) any economic-contribution claim would be offset by the trial court's finding that Danette wasted community assets. Alternatively, Michael contends that Danette was compensated for any economic-contribution claim by the trial court's order that Michael pay her $158,807.89, which he says is slightly less than half of the economic-contribution claim Danette alleged on behalf of the community. We hold that the trial court did not abuse its discretion in declining to recognize an economic-contribution claim on behalf of the community because the trial court could reasonably have determined that Danette's expert failed to provide credible evidence of an essential component of the statutory economic-contribution formula.[3]

---

[3] For purposes of our analysis, we assume without deciding that the community, rather than the partnership, discharged the debt on the construction loans.

7

The law applicable at the time the parties filed their divorce petitions provided that "[a] marital estate that makes an economic contribution to property owned by another marital estate has a claim for economic contribution [against] the benefitted estate." Act of May 28, 2003, 78th Leg., R.S., ch. 230, § 1, 2003 Tex. Gen. Laws 1056, 1056, *repealed by* Act of May 19, 2009, 81st Leg., R.S., ch. 768, § 11(3), 2009 Tex. Gen. Laws 1950, 1953 (former family code section 3.403). The law also provided that, in a divorce decree, "the court shall determine the rights of both spouses in a claim for economic contribution . . . and in a manner that the court considers just and right having due regard for the rights of each party and any children of the marriage shall . . . order a division of a claim for economic contribution of the community marital estate to the separate marital estate of one of the spouses . . . ." Act of May 18, 2001, 77th Leg., R.S., ch. 838, § 5, 2001 Tex. Gen. Laws 1679, 1683-84, *amended by* Act of May 29, 2009, 81st Leg., R.S., ch. 768, § 7, 2009 Tex. Gen. Laws 1950, 1952 (former family code section 7.007).[4]

Former section 3.403 of the family code provides a mandatory formula for determining the amount of an economic-contribution claim in favor of one marital estate against another. Applying the formula provided in former section 3.403, the amount of the community's economic-contribution claim would be equal to the product of the equity in Michael's separate property on the date of divorce ("Equity 2") multiplied by a fraction in which the numerator is the economic contribution to Michael's separate property by the community estate ("Community Contributions") and the denominator is an amount equal to the sum of the Community Contributions,

---

[4] The family code sections relevant to economic-contribution claims that were in effect at the time the original divorce petition was filed have since been repealed but remain controlling for purposes of this appeal.

8

the equity in Michael's separate property as of the date of the first contribution by the community estate ("Equity 1"), and any additional economic contribution by the husband's separate estate after the community's first contribution to the estate ("Separate Estate Contribution"). *See* Act of May 28, 2003, 78th Leg., R.S., ch. 230, § 1, 2003 Tex. Gen. Laws 1056, 1056 (repealed 2009) (former Family Code section 3.403(b), (b–1)(2)). This is mathematically represented as: Economic Contribution = Equity 2 x (Community Contributions/(Community Contributions + Equity 1 + Separate Property Contribution)). *See id*. A spouse seeking economic contribution must bring forth sufficient evidence for the fact-finder to determine the enhancement value to the benefitted estate under this formula. *Hailey v. Hailey*, 176 S.W.3d 374, 388 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

The trial court's findings of fact and conclusions of law do not specify the particular deficiency in Danette's evidence, but her burden on appeal is to establish the economic-contribution claim as a matter of law or to point to evidence that significantly preponderates against the trial court's contrary conclusion. We conclude that Danette has not met this heavy burden because the trial court could have concluded that, even assuming that economic contributions were made by the community estate, there was insufficient evidence to determine the equity in Michael's separate property as of the date of the first contribution by the community estate—the Equity 1 component of the statutory formula. Danette's expert testified that he did not know how much equity Michael had in Block 8 at the time the community estate made its first contribution (i.e., making payment on the construction loans). He further testified, however, that it was reasonable to conclude that Michael's equity at that time was the same as it was when he purchased the property—essentially,

9

the $12,076 down-payment—because it was reasonable to conclude that the property had not increased in value during the nearly three years between the time Michael and his father purchased the property and the time the community made its first payment on the construction loans. The sole basis for the expert's conclusion that the property had not increased in value was that property valuations are often determined using comparable sales within a three-year period.

We hold that the trial court could reasonably have disregarded the expert's opinion as not credible. As the trier of fact, it was within the trial court's province to do so. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-20 (Tex. 2005) (observing that fact-finder is sole judge of witnesses' credibility and weight to give to their testimony and may choose to believe one witness and disbelieve another, including uncontroverted expert testimony unless expert testimony is required). In this case, the trial court could reasonably have determined that the value of Michael's equity in the property nearly three years earlier was not a sufficient proxy for the Equity 1 component of the statutory formula, contrary to the expert witness's opinion. In addition to the fact-finder's general prerogative in evaluating the credibility of witnesses, there are several reasons why the trial court could have so concluded: (1) the fair market value of the property three years earlier was too remote to be a credible proxy for the fair market value of the property at the time of the community's first contribution, (2) the expert provided no market information to justify his conclusion that the property had not likely increased in value, (3) the expert failed to address the likelihood of an increase in equity through reductions in the amount of the purchase lien during the three-year period,

even though the note was due to be paid off shortly after Michael and Danette married,[5] and (4) the expert failed to consider Michael's equity in the value of improvements constructed prior to the marriage. *See* Act of May 18, 2001, 77th Leg., ch. 838, § 2, 2001 Tex. Gen. Laws 1679, 1680, *repealed by* Act of May 19, 2009, 81st Leg., R.S., ch. 768, §11(2), 2009 Tex. Gen. Laws 1950, 1953 (former family code section 3.401) ("'Equity' means . . . the amount computed by subtracting from the fair market value of the property as of a specific date the amount of a lawful lien specific to the property on that same date."); *see also* Garner, Bryan A., *A Dictionary of Modern Legal Usage* at 322 (2d ed. 1995) (defining "equity" as "[t]he amount by which the value of a property or an interest in property exceeds secured claims or liens . . . 'the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of the unsecured creditors.'"). Accordingly, we hold that the court did not abuse its discretion in declining to recognize an economic-contribution claim in favor of the community estate. We overrule Danette's first appellate issue.

### Blocks 1 and 7

In her second issue, Danette asserts that the trial court significantly undervalued the community's interest in Blocks 1 and 7. The principal issues at trial concerning Blocks 1 and 7 were

---

[5] The terms of the promissory note provided that "[t]he principal of this note is due and payable in thirty-six (36) consecutive monthly installments" with "[t]he first installment [] due and payable on or before November 15, 1989, and one installment [] due and payable on or before the 15th day of each succeeding month thereafter until fully paid . . . ." The final installment was due on October 15, 1992. In calculating the community's economic-contribution claim, Danette's expert did not include any increase in equity to the property resulting from payment of this note, and there is no evidence that the note was amended or that Michael and his father were in default.

(1) whether the lots in these blocks were community property or partnership property, (2) the extent of Michael's ownership interest in the partnership, and (3) the value of the property and the business.

The lots in Block 1 were purchased in 1998, and the deed identifies the purchasers as Michael, Danette, and Michael's parents. Block 1 has three buildings—G, H, and I—that were constructed using funds borrowed by Michael, Danette, and Michael's parents. Michael's father provided uncontroverted testimony that (1) the lots in Block 1 were acquired for use by the partnership, (2) the funds to purchase the property came from storage-unit rental income retained by the partnership, (3) the construction loans were paid by the partnership from retained rental income, and (4) the property was used by the partnership exclusively and treated as partnership property on tax returns.

Michael's father purchased the lots in Block 7 several years before he formed the partnership with Michael. There are two buildings on that property—buildings 415 and 515—which existed when Michael's father purchased the property. In 2003 Michael purchased a 49% interest in this property with a $150,000 seller-financed note payable to his father. Each month, the partnership distributed $1,500 to Michael, and Michael used this distribution to pay down the note to his father. At the time of trial, there was approximately $58,000 remaining unpaid on the note. The foregoing facts are undisputed. Michael and his father testified that Michael purchased an interest in Block 7 in order to bring it into the partnership. Michael's father testified that, prior to that time, he had kept two sets of accounting books—one for the Northwest Hills partnership and one for the rental units in buildings 415 and 515, which he alone owned. When it became difficult

12

for him to operate the businesses separately, he suggested that Michael buy into Block 7 so they could consolidate the accounting books.

Michael's expert valued Northwest Hills—including all the lots in Blocks 1, 7, and 8—at $2.22 million using the income-capitalization approach; however, he did not allocate value to the business by building or by block. Danette's expert, also using the income-capitalization method, valued Northwest Hills—including all the lots in Blocks 1, 7, and 8—at $2.23 million and assigned values of $1,134,989 to the buildings in Block 1, $411,357 to the buildings in Block 7, and $683,654 to the buildings in Block 8.

Using a cost approach to valuation, both Michael's and Danette's experts valued the business as follows:

| | |
|---|---|
| Building G (Block 1) | $363,850 |
| Buildings H & I (Block 1) | $483,700 |
| Building 415 (Block 7) | $162,200 |
| Building 515 (Block 7) | $145,000 |
| Buildings A-F (Block 8) | $510,550 |
| Misc. Improvements[6] | $125,000 |
| Land (152,547 sq. ft.) | $122,000 |
| **TOTAL VALUE:** | **$1,912,300** |

---

[6] The miscellaneous improvements were specified as the "as-is" value of asphalt and concrete paving, fencing, gates, signage, security camera system, landscaping, and sprinkler system.

The only difference between the experts' valuations of the property under the cost approach was how to allocate the cost of miscellaneous improvements and land. Michael's expert provided no allocation, but Danette's expert said that both components of value should be allocated among the buildings based on their value. Essentially, the experts agreed on the overall value of the business and the component elements of valuation under both the income-capitalization and cost approaches to valuation.

The principal dispute between the experts centered on the applicability and extent of discounts to be applied to Michael's interest in the business. The main issue was whether Michael in fact holds an interest in Northwest Hills that is properly characterized as "non-controlling." Both Michael and his father testified that Michael holds only a 49% ownership interest in Northwest Hills. Partnership and individual tax returns and other documents admitted at trial confirm this division, as did the transaction involving Michael's purchase of a 49% interest in Block 7. However, the written partnership agreement, which was executed in May 1992, states that the partnership is owned equally by Michael and his father. Danette's expert testified that the value of the partnership should not be discounted because Michael and his father hold equal ownership interests. He stated that an equal, undivided ownership interest requires no adjustment or discount while a majority interest carries a premium value and a minority interest has a reduced value due to lack of control.[7] Michael's expert disagreed, testifying that the value of Michael's share in Northwest Hills must

_____

[7] Curiously, Danette's expert applied a 10% discount for lack of liquidity to Michael's interest in Best Way Carpet even though it was undisputed that Michael is an equal owner in that business and even though Best Way Carpet does not appear to be any more illiquid than Northwest Hills.

be reduced by 40% to reflect lack of marketability/liquidity regardless of whether Michael has a 49% undivided interest or is an equal owner. He stated that, in either case, a 40% deduction for lack of marketability/liquidity would be appropriate because a 50% ownership interest is still properly characterized as a non-controlling interest and is less marketable. He further testified, however, that if the partnership interest was only 49%, an additional deduction of 20% for lack of control would apply. A real estate appraiser also testified at trial on Michael's behalf regarding the value of the real property used by Northwest Hills and Best Way Carpet. He testified generally that the industry-wide standard is to reduce the value of an undivided interest in real property by one-third because "[i]t's more difficult to sell a piece of property when there is an undivided interest, trying to get two people to agree on the sales agreement."

In the final divorce decree, the court awarded Michael "[t]he business known as Northwest Hills, including all community interest, including but not limited to all interest in the lots in Block 1 . . . and in the lots in Block 7 and 8 . . . ." Before rendering final judgment, the court issued a memorandum ruling declaring Michael's interest in Block 8 to be his separate property and his interest in Northwest Hills, including Blocks 1 and 7, to be community property.[8] In amended findings of fact and conclusions of law, the trial court reiterated that the lots in Block 8 were Michael's separate property and determined that the value of the community portion of the

---

[8] In the memorandum ruling, the court stated that "the following community property is awarded to Respondent [Michael] . . . All right, title and interest in and to the business known as 'Northwest Hills,'" which included "all of the community interest" in Blocks 1 and 7 of the Milestone Planned Development Number One.

15

Northwest Hills storage business and real estate, including Blocks 1 and 7, totaled $82,125.[9] To the extent the trial court concluded that the property used in the storage business was either community or separate property, the court implicitly determined that it was not partnership property, because partnership property is neither community property nor separate property in nature. *See Lifshutz*, 199 S.W.3d at 27 ("Under the entity theory [of partnership], all property brought into the partnership is partnership property and, as partnership property, does not retain either a community or separate property nature [for purposes of community property principles relating to marriage]."). But with respect to the trial court's disposition of the lots in Blocks 1 and 7, the trial court appears to have found (somewhat incongruously) that these lots were partnership property and that Michael's interest in the storage business, including these assets, was community property. The trial court made no express fact findings resolving the disputes about Michael's ownership percentage or the applicable discounts, but the court's valuation of the community's interest in Northwest Hills is

---

[9] The court described the property being valued and awarded as follows:

5.    During the marriage, Petitioner and Respondent acquired the following property other than by gift or inheritance with the values shown:

. . . .

Business known as "Northwest Hills," including but not limited to all furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods, supplies, and all personal property used in connection with the operation of the business, and also including all of the community interest in the lots in Block 1, Replat of Milestone Planned Development Number One, and the lots in Block 7, Replat of Milestone Planned Development Number One, Bell County, Texas, more particularly described in Exhibit "A" to the Final Decree of Divorce signed on December 20, 2011[.] [Valued at] $82,125.00.

consistent with an application of a non-controlling interest discount and with a finding that Michael owned a 49% interest in the partnership.

On appeal, Danette contends the evidence establishes that Northwest Hills is valued at a minimum of $2.22 million under the income-capitalization approach and that the trial court erred in applying non-controlling interest discounts because Michael owns 50% of the business per the partnership agreement. Accordingly, she contends that the community's interest in Northwest Hills is $1.11 million. Alternatively, if discounts are applied, she contends that the uncontroverted evidence establishes a minimum value of $521,909 for the business.

Danette's claim that the "uncontroverted" evidence establishes a minimum value of $2.2 million for the storage business is flawed because she includes in that figure value calculations that her expert conceded were attributable only to the buildings on Block 8, which she does not dispute are Michael's separate property. Excluding the value attributable to Block 8 leaves a maximum value of $1,546,346 for the business under the income-capitalization approach and $1,401,750 under the cost approach (if land and miscellaneous improvements are not allocated by building value). Although Danette's appellate argument implies that only the income-capitalization approach should be considered, the court was free to consider both methods in determining the value of the property in the marital estate because both of these methods were presented in the expert reports admitted at trial. Aside from Danette's faulty premise regarding the minimum value of the business, we agree that the trial court significantly undervalued the community's interest in Northwest Hills because there does not appear to be any value attributable to the community's

17

interest in Block 1 even though the divorce decree indicates that there is at least some portion of Block 1 that was acquired by the parties (or the partnership) during the marriage.

Although the trial court did not explain its methodology in valuing "the business known as Northwest Hills," "including all of the community interest in the lots in Block 1 . . . and the lots in Block 7," the $82,125 value the trial court assigned to the business is identical to the valuation proposed in Michael's written final argument as the community's contribution to the partnership. The figure Michael proposed, which the trial court apparently adopted, was based on an ownership interest of 49% and a non-controlling interest discount of 33% (based on the real estate appraiser's testimony regarding reductions in value for undivided interests). According to Michael, Blocks 1, 7, and 8 are partnership property and his interest in the partnership is his separate property, having its inception no later than execution of the partnership agreement in May 1992. In his view, therefore, the only community-property interest in Northwest Hills is the 49% interest in the lots in Block 7, which Michael purchased after marriage, paid for with profits distributed to him by the partnership, and contributed to the Northwest Hills partnership. Accordingly, Michael contends that the community has an interest only in the buildings on the lots in Block 7—buildings 415 and 515—and the accompanying land. Per the appraisals admitted at trial, which were not contested, buildings 415 and 515 were valued at $162,200 and $145,000, respectively, using the "appraisal cost approach" for a total of $307,200. The land in Blocks 1, 7, and 8 was separately valued at a total of $122,000, which was not segregated among the tracts of land; consequently, Michael conceded that the entire value of the land must be considered to be part of the community's contribution of Block 7 to the partnership. Based on these values, which were not contested by Danette or her

18

expert, Michael valued the community interest at $82,125 by adding the building and land value ($307,000[10] + $122,000 = $429,000), reducing that figure by his 49% ownership interest, applying an additional non-controlling interest discount of 33.3%, and then deducting the outstanding balance of $58,000 on the note to Michael's father. This is exactly the amount that the trial court found to be the value of the entire community-property interest in the Northwest Hills partnership.

There was conflicting evidence about whether Michael holds an equal ownership interest in Northwest Hills or a 49% ownership interest, and there was conflicting expert testimony about whether discounts should be applied to Northwest Hill's value if Michael holds an equal ownership interest. As a reviewing court, we give deference to the responsibility of the fact-finder to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Based on the evidence at trial, the trial court could reasonably have determined these issues in Michael's favor and valued the business accordingly. Even so, however, there were errors in the trial court's valuation of the business that so significantly undervalued the community's interest in Northwest Hills—as awarded by the court—that a new division of the marital estate is required.

One error is the failure to attribute any value to the $125,000 in miscellaneous improvements that the experts included in the cost approach to valuation, which the trial court evidently used to value the community's interest in Northwest Hills. The more significant error is the court's failure to assign any value to Block 1, which is contrary to undisputed evidence that a

---

[10]  In his calculations, Michael erroneously stated this figure as $307,000, which we use because the trial court apparently did as well.

significant portion of the storage business's value is attributable to the buildings on the lots in that block, regardless of whether the court valued the property under the income-capitalization method or the cost approach to valuation. The failure to assign any value to Block 1 could make sense only if the court determined either that the lots in Block 1 are Michael's separate property or that his interest in the storage business is. But if the trial court intended to treat either Block 1 or the partnership as Michael's separate property and value Block 7 as the only community contribution to the partnership, such intention is not evident from the final divorce decree or the trial court's findings and conclusions. Indeed, some of the court's findings and conclusions are inconsistent with such an intention.

In its findings and conclusions, the trial court identified the storage business as community property and awarded it to Michael. The trial court further identified Blocks 1 and 7 as assets of the storage business that were acquired during the marriage. Yet the value the trial court assigned to the storage business can only be traced to evidence related to the value of Block 7, as analyzed by Michael in his closing argument. Because there was undisputed evidence of some value attributable to Block 1, the trial court's valuation of Northwest Hills simply cannot be squared with the evidence. And because the experts testified that Block 1 added several hundred thousand dollars to the value of Northwest Hills (even if discounts are applied), the trial court's failure to assign some value to this property resulted in a property division so disproportionate as to constitute an abuse of discretion and requires that we remand the cause to the trial court for a new just and right division of the community estate. *See Grossnickle*, 935 S.W.2d at 851. We therefore sustain Danette's second appellate issue.

***Best Way Carpet***

In the first part of her third issue, Danette asserts that the trial court abused its discretion by not valuing and disposing of the community's interest in two lots upon which Best Way Carpet operated. Michael formed a partnership in Best Way Carpet with his friend, Bret Stafford, while he was married to Danette. It is undisputed that Michael's interest in Best Way Carpet is community property and that he holds an equal ownership interest, although there is some evidence that the partnership operated with Stafford as the final decision-maker. In 1995 Michael and Stafford purchased Lots 7, 8, and 9 in Block Number 1 of Northwest Hills Commercial Subdivision (not to be confused with the Northwest Hills storage business, which operates on lots in the Milestone Planned Development). The carpet business presently operates in an improved structure on Lots 8 and 9; Lot 7 was sold during the marriage and is not at issue in the divorce proceedings. In 1999 Michael and Stafford also purchased Lot 4 in the Milestone Planned Development Number One. Lot 4 is used by Best Way Carpet for storage of inventory.

The trial court valued Lot 4 at $27,600 and awarded it to Michael. Danette does not dispute this disposition. The trial court also awarded Michael the following interest in Best Way Carpet, which it valued at $336,519:

> [a]n undivided one-half interest in the business known as Best Way Carpets [sic], including all ownership interest in Best Way Carpet Services, Ltd. and Best Way Carpet Management, LLC, including but not limited to all furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods and supplies; all personal property used in connection with the operation of the business; and all rights and privileges past, present, or future, arising out of or in connection with the operation of the business.

21

The value the court assigned to Michael's interest in Best Way Carpet is equivalent to the value provided by Michael's expert witness and reflects a 30% discount for lack of marketability/liquidity, a 25% discount for lack of control, and a 49.5% ownership interest. Danette does not dispute the trial court's valuation of Best Way Carpet or the application of these discounts. Rather, Danette argues that the trial court failed to dispose of the community's 50% interest in Lots 8 and 9. Danette requested additional findings of fact and conclusions of law regarding the value of Lots 8 and 9, but the trial court did not make any additional findings or conclusions related to this property. There is no dispute, however, that the lots are worth $434,000 before any deductions are applied; the only issue is whether the trial court disposed of this property in the final divorce decree.

The trial court did not specifically mention Lots 8 and 9 in the final divorce decree or in its amended findings of fact or conclusions of law. The court also did not mention real property, buildings, or land in valuing and awarding Best Way Carpet. However, by adopting the valuation of the business proposed by Michael's expert, the trial court appears to have recognized the value of these lots as a major component of the business's value and, therefore, valued and disposed of this property in its award to Michael of an undivided one-half interest in Best Way Carpet.

Michael's expert valued Best Way Carpet at $1,294,926 before adjustments and discounts were applied. In determining the business's value, the expert used an "income-oriented" approach, which "assumes that all of the assets, tangible or intangible, are indistinguishable parts of the business, and does not attempt to separate the values of the two." Best Way Carpet's adjusted balance summary sheets, which were included in the expert's report, included a fixed asset value of

22

$1,171,979 for calendar year 2010, which included "property, plant, & equipment" valued at $1,155,521 and "land" valued at $16,458. Although there is no listing of the assets used to generate these values, there was testimony at trial that Best Way Carpet operates in a building constructed on Lots 8 and 9, and the income statement attached to the expert's report valuing the business shows no expense for rent, which is consistent with the business owning the property on which it operates. Taking the foregoing evidence together, it is reasonable to conclude that the trial court accounted for the value of Lots 8 and 9 when it valued Best Way Carpet using the income-asset approach and that the lots were therefore disposed of when Michael's interest in the business was awarded to him at the stated value.[11]

However, Danette's concern regarding the disposition of Lots 8 and 9 is understandable because there is an incongruity in the way the trial court apparently valued and disposed of Lots 8 and 9 in the final divorce decree and the way Lot 4 was treated in the final divorce decree. Lot 4 was valued and awarded separately from the business even though it was acquired in a manner similar to Lots 8 and 9 and there was testimony that it was used by the partnership for storage. Although there is no apparent reason why these lots should have been disposed of in a different manner, the trial court did dispose of them. Accordingly, we overrule Danette's third appellate issue complaining about the disposition of Lots 8 and 9. However, because we must remand the entire community estate for a new division of property based on the trial court's error in valuing the community's interest in the Northwest Hills storage business, *Jacobs v. Jacobs*,

---

[11] Notably, Danette did not include these lots in her inventory and proposed division of the community estate. Her expert also did not include values for Lots 8 and 9 in his listing of the parties' real property. Both, however, included separate values for Lot 4 and Best Way Carpet.

687 S.W.2d 731, 733 (Tex. 1985), the trial court will have the opportunity to revisit its valuation and

disposition of Lots 4, 8, and 9.[12]

### *Disposition of Post-Filing Income*

The trial court concluded that Danette wasted $298,495 in community assets that were

in her possession after she initiated divorce proceedings. In her fourth issue on appeal, Danette

contends there is no evidence that she disposed of community assets for non-community purposes.

Danette maintains that she adequately accounted for her expenses, which included $11,500 in

medical bills from a car accident, $57,500 in attorneys' fees, unspecified travel fees and hotel

expenses related to the divorce proceedings, and living expenses, including rent of between $2,500

and $3,400 per month.

We need not decide at this time whether the trial court's waste finding was erroneous

because, even if it was, Danette was not harmed by the finding. The parties asked for an equal

division of property, and the trial court awarded Danette 49.7% of the estate as valued by the court.

---

[12] Michael contends that the trial court awarded Lots 8 and 9 to him in the final divorce decree by virtue of the following language:

> WILLIAM MICHAEL PAPPAS, is awarded the following as his sole and separate property . . . [T]he business known as Northwest Hills, including . . . all interest in the lots *in Block 1, Replat of Milestone Planned Development Number One*, and in the lots in Block 7 and Replat of Milestone Planned Development Number One . . . more particularly described *in Exhibit A* . . . .

(Emphases added.) We do not believe the final decree can be so construed. Although Exhibit A includes the legal description of Lots 8 and 9 in the Northwest Hills Commercial Subdivision, it appears that Michael is either failing to recognize the decretal language limiting the award to the lots in the *Milestone Planned Development* or is confused by the similarity in the names of the storage business and the subdivision in which Lots 8 and 9 are situated.

There is nothing in the final divorce decree, the findings of fact and conclusions of law, or the trial court's division of assets indicating that Danette was penalized in the division of assets based on the waste finding.[13]

In the second part of her third issue, Danette complains that the trial court failed to make requested fact findings regarding the amount and disposition of money Michael had in his possession after divorce proceedings were initiated and, consequently, that the court failed to dispose of community funds Michael earned after she filed for divorce. At trial, Danette focused more on the period before she filed, arguing that Michael had earned, but failed to account for, more than $1.2 million dollars in 2006, 2007, 2008, and the portion of 2009 that preceded the divorce proceedings. On appeal, she focuses on testimony that, in the twenty months between the filing of divorce in May 2009 and trial, Michael earned approximately $375,000—$10,000 per month in salary from Best Way, $1,500 per month in distributions from Northwest Hills, one-half of an IRS refund check (approximately $27,000), and one-half of proceeds from a land transaction (approximately $44,000). She contends that approximately $211,000 of this money was not accounted for and remains undivided. Contrary to Danette's claim on appeal, the trial court expressly found that "[Michael] did not conceal or otherwise fail to account for $1,000,000.00

---

[13] At worst, the trial court offset the amount of wasted funds from the economic-contribution claim Danette asserted against Michael's separate property interest in Block 8. The trial court declined to recognize that claim, but in the alternative, found that it was accounted for in the division of property. Because the trial court awarded the parties the nearly equal division of property they requested, the court's alternative holding regarding the economic-contribution claim would make sense only if the waste finding offset an economic-contribution claim, if one were found to exist. We have already determined that the trial court did not abuse its discretion in declining to recognize the community's economic-contribution claim; accordingly, there is no apparent harm to Danette arising from the finding that she wasted community assets.

(or any other amount) in community assets" and concluded that "[Danette]'s claim that [Michael] concealed or failed to account for $1,000,000.00 in community assets is not supported by credible evidence." Thus, as we perceive it, the real issue is not the trial court's failure to make a fact-finding, but whether the trial court's finding is supported by the evidence.

To account for the disposition of funds in the pre-divorce time period of 2006-2009, Michael offered testimony from his bookkeeper, who provided accounting records and testimony regarding his income and expenses during that time period. Danette apparently is no longer pursuing a claim of concealment as to those periods of time. With regard to funds Michael acquired and disposed of after Danette filed for divorce, he testified that (1) the $1,500 monthly payment from Northwest Hills is used every month to pay off the loan from his father on Block 7, (2) Danette's half of the IRS tax-refund check had already been disbursed to her, (3) Danette's half of the land transactions had already been disbursed to her, except for a small check that she failed to collect from the title company, (4) he paid $3,500 to $4,500 per month in spousal support to Danette, (5) he paid $20,000 in attorneys' fees, and (e) he used the remaining funds for living expenses (including a mortgage on the marital residence) and quarterly tax payments on his partnership income. Although he did not provide testimony as to his precise expenses in the post-filing time period, there was evidence that he had monthly expenses of at least $8,000 and paid an unspecified amount of quarterly tax payments. There is also evidence in the record of historical expenses in the pre-divorce time period of 2006-2008, which showed approximate monthly house and insurance payments of $1,850, property taxes of $6,500 per year, and "quarterly and taxes" of more than $100,000 per year on average. In addition, Danette did not dispute that she had already received her half of the IRS

26

refund and land transaction proceeds. Based on the foregoing evidence, the trial court could reasonably have concluded that Michael did not conceal any assets and that there were no further community assets to be divided by the court.[14] We overrule Danette's third and fourth appellate issues.[15]

## CONCLUSION

Having determined that the trial court erred in its calculation and division of what it determined to be Danette and Michael's community-property estate, we reverse the portion of the trial court's decree dividing the community estate and remand the cause to the trial court for a new just and right division of the community estate.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Reversed and Remanded

Filed:   January 10, 2013

---

[14] Furthermore, Danette's claims of concealment are not supported by her pleadings, and a judgment must conform to the pleadings. Tex. R. Civ. P. 301; *Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 812 (Tex. 1983); *Khalaf v. Williams*, 814 S.W.2d 854, 858 (Tex. App.—Houston [1st Dist.] 1991, no writ).

[15] In her fifth issue, Danette asserts that the cumulative effect of the trial court's errors in valuing property in the community estate resulted in a division of the marital estate that is so disproportionate as to be manifestly unjust. Because we have sustained issue two, which will require a remand for a new just and right division of the community estate, we need not address issue five. *See* Tex. R. App. P. 47.1.